CITY OF WAUWATOSA, Respondent, v. KING, Appellant.

*No. 218.  Argued December 1, 1970.—Decided January 8, 1971.*
(Also reported in 182 N. W. 2d 530.)

400

For the appellant there were briefs by *Goldberg, Previant & Uelmen,* and oral argument by *John S. Williamson, Jr.,* all of Milwaukee.

For the respondent there was a brief and oral argument by *George R. Schimmel* of Milwaukee, special assistant city attorney for the city of Wauwatosa.

ROBERT W. HANSEN, J.   Can a city by ordinance or a state by statute prohibit picketing before or about the home or dwelling of any individual in the community?

Answering that question raises several additional questions that must be asked and answered in turn.

1. *Are picketing, demonstrating and parading constitutionally protected against any public regulation?*

Here we have 25 to 35 persons marching up and down, in one case on the sidewalk, in the other on the lawn, in front of homes of members of the local school board. This is not the traditional trade union picketing of a place of employment during a labor dispute to discourage other workers and patrons from crossing a picket line. Initially, the picketers had done their marching in front of school buildings at which they were employed. However, when local press, radio and TV outlets paid no attention to their efforts, it was decided to picket the homes of school board members to secure news media attention, which was thus secured. Why the media found greater news or shock value in the shift of locale is left unexplained. The homes here picketed were selected as targets as a device or tactic to secure mass media attention. Such use of picketing, demonstrating and parading to secure publicity is by now a familiar phenomenon.[1] It is clearly related to the communication

[1] ". . . [G]roups adopted plans under which they marched on the streets carrying placards, chanting, and singing songs, all designed to publicize their grievances and to petition the various units of government, state and national, for a redress of their grievances. Their activities along these lines quite obviously aroused highly emotional feelings both on their part, and on the part of others who opposed the changes in local laws and customs which the 'picketers' and 'demonstrators' advocated. . . . This

of ideas and constitutional guarantees of free speech, press, assembly and petition. Is it thereby insulated against any public control or regulation in any degree or for any purpose?

The massing and marching of 25 to 35 picketers on the lawn or sidewalk of a man's home involves more than the conveying of information to him or his neighbors. Even as to media coverage, it would be naive to believe that reporters and TV cameramen assembled to record and report what was lettered on the placards the marchers carried. That opportunity they had passed up when the placards were earlier carried in front of school buildings. What is involved is a process more complex than conveying information.[2] What is involved is conduct, as well as words or ideas.

Examination of United States Supreme Court decisions on this point reveals that earlier intimations that picketing might be no more than a communication of ideas,[3] have had to yield " 'to the impact of facts unforeseen' or at least not sufficiently anticipated." [4] One such fact clearly is that the element of physical patrolling in picketing itself can induce action very different from

---

court. . . has had its difficulties and sharp differences of opinion in deciding the precise boundaries dividing what is constitutionally permissible and impermissible in this field. . . ." Mr. Justice BLACK, in concurring opinion, *Gregory v. Chicago* (1969), 394 U. S. 111, 114, 89 Sup. Ct. 946, 22 L. Ed. 2d 134.

[2] ". . . our federal constitution does not render the states powerless to regulate the conduct of demonstrators and picketers, conduct which is more than 'speech,' more than 'press,' more than 'assembly,' and more than 'petition,' as those terms are used in the first amendment. Narrowly drawn statutes regulating the conduct of demonstrators and picketers are not impossible to draft. . . ." *Id.* at page 124.

[3] See: *Thornhill v. Alabama* (1940), 310 U. S. 88, 60 Sup. Ct. 736, 84 L. Ed. 1093; *Carlson v. California* (1940), 310 U. S. 106, 60 Sup. Ct. 746, 84 L. Ed. 1104.

[4] *Teamsters Union v. Vogt, Inc.* (1957), 354 U. S. 284, 289, 77 Sup. Ct. 1166, 1 L. Ed. 2d 1347.

the point of view being communicated.[5] In a number of cases the United States Supreme Court has made clear the fact that picketing involves more than an exercise of free speech, and that the conduct involved is subject to public regulation.[6] Freedom of speech is to be jealously guarded, but, when intertwined with conduct, total freedom stops and the right to regulate begins.[7] Picketing, demonstrating and parading involve conduct that can be regulated.[8] Liberty, constitutionally guaranteed, demands a society capable of maintaining public order, a public order that necessarily regulates conduct.[9]

2. *Is there a right to enjoy well-being, tranquility and privacy in one's home?*

While there is a right to regulate picketing, demonstrating and parading, any such public control or limitation must be based upon the furtherance of a state interest.[10] Is it such proper interest of the state to insure, in the words of the Wauwatosa ordinance, "that members of the community enjoy in their homes and dwellings a feeling of well-being, tranquility, and pri-

[5] *Hughes v. Superior Court* (1950), 339 U. S. 460, 70 Sup. Ct. 718, 94 L. Ed. 985.

[6] ". . . [I]t has never been deemed an abridgment of freedom of speech or press to make a course of conduct illegal merely because the conduct was in part initiated, evidenced, or carried out by means of language, either spoken, written, or printed. . . ." *Giboney v. Empire Storage Co.* (1949), 336 U. S. 490, 502, 69 Sup. Ct. 684, 93 L. Ed. 834. *See also: Carpenters Union v. Ritter's Cafe* (1942), 315 U. S. 722, 62 Sup. Ct. 807, 86 L. Ed. 1143.

[7] *Food Employees v. Logan Plaza* (1968), 391 U. S. 308, 313, 88 Sup. Ct. 1601, 20 L. Ed. 2d 603.

[8] ". . . Speech and press are, of course, to be free, so that public matters can be discussed with impunity. But picketing and demonstrating can be regulated like other conduct of men. . . ." Mr. Justice BLACK, in concurring opinion, *Gregory v. Chicago, supra,* at page 125.

[9] *Cox v. Louisiana* (1965), 379 U. S. 536, 554, 85 Sup. Ct. 453, 464, 13 L. Ed. 2d 471.

[10] *Teamsters Union v. Vogt, Inc., supra,* at page 293.

vacy"? The premise of the ordinance is that "the public health and welfare and the good order of the community" require such protection of homes and residences in the city. The "well-being and tranquility of a community" are also set forth as purposes to be served. They are legitimate objects of state or city legislative enactments beyond the fact of their relatedness to health, morals or safety.[11]

The right to protect the tranquility of the community certainly includes the right to protect tranquility of individual homes. If tranquility is not protected at the level of the home, it can hardly be preserved at the level of the community. The safeguarding of the home is a vital public interest.[12] That references to the right to be undisturbed in one's own home are brief, almost casual, in United States Supreme Court decisions must be taken to mean that this fundamental right is considered beyond challenge, not needing frequent defense. For example, the court speaks of the ". . . unanimity that opportunists . . . cannot be permitted to arm themselves with an acceptable principle, such as . . . a free press, and proceed to use it as an iron standard to

[11] ". . . The police power of a state extends beyond health, morals and safety, and comprehends the duty, within constitutional limitations, to protect the well-being and tranquility of a community. . . ." *Kovacs v. Cooper* (1949), 336 U. S. 77, 83, 69 Sup. Ct. 448, 93 L. Ed. 513.

[12] ". . . 'Certainly the safeguarding of the home does not follow merely from the sanctity of property rights. The home derives its pre-eminence as the seat of family life. And the integrity of that life is something so fundamental that it has been found to draw to its protection the principles of more than one explicitly granted constitutional right. . . .'

"The entire fabric of the constitution and the purposes that clearly underlie its specific guarantees demonstrate that the rights to marital privacy and to marry and raise a family are of similar order and magnitude as the fundamental rights specifically protected." Mr. Justice GOLDBERG, in concurring opinion, *Griswold v. Connecticut* (1965), 381 U. S. 479, 495, 85 Sup. Ct. 1678, 14 L. Ed. 2d 510.

smooth their path by crushing the living rights of others to privacy and repose." [13] Passengers on public transit vehicles, objecting to piped-in radio music, were told by the court that they wrongly assumed that they had ". . . a right of privacy substantially equal to the privacy to which he is entitled in his own home. . . ." [14] In a recent case dealing with the picketing of a privately owned shopping center, the court stated, ". . . However, unlike a situation involving a person's home, no meaningful claim to protection of a right of privacy can be advanced by respondents here. . . ." [15] In a very recent case, upholding a statute that provided that a householder who receives pandering-type advertisements may require that the mailer remove his name from its mailing list and stop all future mailings, the court stated that, ". . . Nothing in the constitution compels us to listen to or view any unwanted communication, whatever its merit; . . ." [16] A man is not to be made a captive in his own home. Neither is he required to defend it, as some new Alamo, against unwelcome intruders or disturbers. It is a proper serving of a proper state interest for a state or community to seek to protect the privacy and tranquility of the homes of its residents.

[13] *Breard v. Alexandria* (1951), 341 U. S. 622, 625, 626, 71 Sup. Ct. 920, 95 L. Ed. 1233.

[14] *Public Utilities Comm. v. Pollak* (1952), 343 U. S. 451, 464, 72 Sup. Ct. 813, 96 L. Ed. 1068.

[15] *Food Employees v. Logan Plaza, supra,* at page 324.

[16] ". . . The ancient concept that 'a man's home is his castle' into which 'not even the king may enter' has lost none of its vitality, and none of the recognized exceptions includes any right to communicate offensively with another. . . .

". . . [N]o one has a right to press even 'good' ideas on an unwilling recipient. That we are often 'captives' outside the sanctuary of the home and subject to objectionable speech and other sound does not mean we must be captives everywhere. . . ." *Rowan v. Post Office Dept.* (1970), 397 U. S. 728, 737, 738, 90 Sup. Ct. 1484, 25 L. Ed. 2d 736.

3. *Can a constitutionally valid limitation on picketing be based upon the locale of such picketing?*

The Wauwatosa ordinance is clearly and sharply limited to picketing "before or about the residence or dwelling of any individual." It did not affect the earlier picketing in this case at school buildings in the city. It does not affect picketing, demonstrating or parading anywhere in the city except "before or about the residence or dwelling of any individual." This constitutes a limitation on the right to picket based not upon the nature or purpose of the picketing but upon the place of the picketing. Is this permissible?

Decisions of the United States Supreme Court make clear that a prohibition of picketing, demonstrating and parading in a certain designated area is not constitutionally prohibited. The state interest justifying such area-based controls is the orderly functioning of the activity carried on in such areas, an activity that would be interfered with by the presence of pickets, demonstrators or paraders. The court upheld a Louisiana statute prohibiting picketing near a courthouse with intent to obstruct justice,[17] saying of that statute, "[i]t prohibits a particular type of conduct, namely, picketing and parading, in a few specified locations, in or near courthouses."[18] A ban on picketing based on the situs or place of picketing was upheld. In another case, the court upheld the conviction for trespass upon county jail premises of a petitioner who claimed he was seeking to exercise first amendment rights in protesting jail policies. Though not a picketing case, the court recognized the state's right to protect the jail area for security reasons.[19]

---

[17] *Cox v. Louisiana, supra,* footnote 9.

[18] *Id.* at page 562.

[19] ". . . [T]here is no merit to the petitioners' argument that they had a constitutional right to stay on the property, over the jail custodian's objections, because this 'area chosen for the peaceful civil rights demonstration was not only "reasonable" but

In a third case, the court upheld the conviction under the Mississippi anti-picketing law, which, as applicable, prohibited "'picketing . . . in such a manner as to obstruct or unreasonably interfere with free ingress or egress to and from any . . . county . . . courthouses . . . .'" [20] As in *Cox,* the court found the area-based ban on courthouse picketing to be a furtherance of a proper and substantial state interest.

While these cases relate to public functions being carried out in public buildings, that factor does not affect the right to limit picketing on an area basis nor the requirement that a proper state interest be served by the limitation. Rather, as Mr. Justice BLACK concludes, the result is:

". . . Plainly, however, no mandate in our constitution leaves states and governmental units powerless to pass laws to protect the public from the kind of boisterous and threatening conduct that disturbs the tranquility of spots selected by the people for homes, wherein they can escape the hurly-burly of the outside business and political world, or for public and other buildings that require peace and quiet to carry out their functions, such as courts, libraries, schools, and hospitals." [21]

4. *Is the ban on all picketing of homes reasonably required to protect the privacy and tranquility of such homes?*

---

also particularly appropriate. . . .' Such an argument has as its major unarticulated premise the assumption that people who want to propagandize protests or views have a constitutional right to do so whenever and however and wherever they please. That concept of constitutional law was vigorously and forthrightly rejected in two of the cases petitioners rely on, *Cox v. Louisiana, supra,* [379 U. S.] at 554–555 and 563–564, [13 L. Ed. 2d at 484 and 491, 492]. We reject it again. . ." *Adderley v. Florida* (1966), 385 U. S. 39, 47, 87 Sup. Ct. 242, 17 L. Ed. 2d 149.

[20] *Cameron v. Johnson* (1968), 390 U. S. 611, 616, 88 Sup. Ct. 1335, 20 L. Ed. 2d 182.

[21] Mr. Justice BLACK, in concurring opinion, *Gregory v. Chicago, supra,* at page 118.

Defendant's reply brief appears to concede that the city of Wauwatosa could draft a narrowly drawn ordinance prohibiting *disruptive* picketing before or about the dwelling or residence of any individual.[22] It is certainly true that an ordinance or statute that seeks to further a certain state interest must be sharply and strictly limited in its scope to prohibiting only the conduct that needs to be barred to accomplish such stated purpose.[23]

Parenthetically only, we make the comment that adding the word "disruptive" would have narrowed the ordinance, but might well have done so at the expense of clarity. While, in *Cameron*,[24] the United States Supreme Court refused to find the statute prohibiting courthouse picketing which obstructed free ingress or egress " 'so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application,' " [25] lack of vagueness is accepted as a proper test. It is at least arguable that the word "disruptive" shares the weakness of the phrase "disorderly conduct" which has been described as "gathering in one comprehensive definition of an offense a number of words which have a multiplicity of meanings," [26] an inbuilt vagueness

---

[22] ". . . It is precisely because the city of Wauwatosa has refused to draft a narrowly drawn statute forbidding *disruptive* picketing that this case is before the court . . . ." [Emphasis not added.] Appellant's Reply Brief, at page 10.

[23] ". . . [T]he constitution does not bar enactment of laws regulating conduct, even though connected with speech, press, assembly, and petition, if such laws specifically bar only the conduct deemed obnoxious and are carefully and narrowly aimed at that forbidden conduct. . . ." Mr. Justice BLACK, in concurring opinion, *Gregory v. Chicago, supra,* at page 118.

[24] *Cameron v. Johnson, supra,* footnote 20.

[25] *Id.* at page 616 (citing *Connally v. General Construction Co.* (1926), 269 U. S. 385, 391, 46 Sup. Ct. 126, 70 L. Ed. 322.

[26] Mr. Justice BLACK, in concurring opinion, *Gregory v. Chicago, supra,* at pages 118, 119, the judge additionally commenting: ". . . The average person charged with its violation is

not cured by narrowed court construction ". . . if the narrowing construction is so unforeseeable that men of common intelligence could not have realized the law's limited scope at the only relevant time, when their acts were committed . . . ." [27]

Narrowness is a means, not an end. It is a means of testing whether or not the regulation or prohibition is strictly limited to what is required to implement the legitimate state interest being served. In *Cox*,[28] the state's legitimate interest was that of protecting its judicial system, so the restriction on picketing or parading around the courthouse banned only picketing and parading "with intent to obstruct justice." In *Cameron*,[29] the state's stated purpose was to ban courthouse picketing only if done " '. . . in such a manner as to obstruct or unreasonably interfere with free ingress or egress to and from [such] county . . . courthouses . . . .' " The ban was limited to and by the purpose sought to be served. In *Adderley*,[30] the state's interest was in the security of the county jail premises, so the state's power, as the court put it, was the "power to preserve the property under its control for the use to which it is lawfully dedicated." [31] If we were dealing with a prohibition on picketing or parading outside a hospital, the necessity for quiet in such hospital area might well make the factor of noise the qualifying and limiting factor as to

necessarily left uncertain as to what conduct and attitudes of mind would be enough to convict under it. Who, for example, could possibly foresee what kind of noise or protected speech would be held to be 'improper' ? . . ." at page 119. (The *Gregory Case* was tried under the general disorderly conduct ordinance, neither the city nor state then having an ordinance or statute forbidding or regulating picketing in residential neighborhoods.)

[27] *Id.* at page 121.
[28] *Cox v. Louisiana, supra,* footnote 9.
[29] *Cameron v. Johnson, supra,* footnote 20.
[30] *Adderley v. Florida, supra,* footnote 19.
[31] *Id.* at page 47.

the reasonableness and relatedness of a prohibition on picketing to the public purpose being served. However, here no decibel reading is required to certify to the adverse impact upon privacy and tranquility of having 25 to 35 persons marching up and down in front of the house.

Here the public purpose to be served is that "members of the community enjoy in their homes and dwellings a feeling of well-being, tranquility and privacy." Can it be said that picketing before or about the house, ipso facto, disturbs such family well-being and home tranquility and dwelling place privacy? Is the basic premise of the Wauwatosa ordinance that "the practice of picketing before or about residences and dwellings causes emotional disturbance and distress to the occupants" a reasonable one?

Tranquility and privacy are fragile enough flowers, particularly in a home setting. Home is where the husband comes, or both husband and wife come, after the day's work, to relax and put aside the cares of the outside world. Home is where the wife expects, in addition to the work of the household and the care of the children, to have some moments of peace and calmness. Home is where the children come not only to eat and sleep, but also to do their homework and to go out in the yard and play with the youngsters in the neighborhood. Home is many things, most of them intangibles, not just a house and shelter, but an opportunity to rest, relax and recharge batteries for the morrow. Of such ingredients is tranquility made up, and privacy derived. Can it be seriously contended that the 25 to 35 picketers parading up and down in front of the homes here involved did not adversely affect the well-being, tranquility and privacy of the folks at home in their homes? To those inside and to the neighbors, the home becomes something less than a home when and while the picketing, demonstrating and parading continue. Putting aside the not neces-

sarily unreasonable fear of escalation—action and reaction between picketers and spectators—the very fact of the physical patrolling and marching by the group of uninvited and unwelcome paraders creates pressure. The newsworthiness of the situation stems in part from the tensions created and pressures focused on the home. Such tensions and pressures may be psychological, not physical, but they are not, for that reason, less inimical to family privacy and truly domestic tranquility. If, as we have said, it is a proper public purpose to protect both privacy and tranquility, then the prohibiting of picketing before or about the home is a clearly related and entirely reasonable means to such end.

5. *Do the exceptions in the ordinance deny equal protection of the laws?*

This leaves to be considered solely the attack made upon the exceptions noted in the ordinance. Two exceptions to the prohibition of residential or home picketing are made by the ordinance in these words:

". . . Nothing herein shall be deemed to prohibit (1) picketing in any lawful manner during a labor dispute of the place of employment involved in such labor dispute, or (2) the holding of a meeting or assembly on any premises commonly used for the discussion of subjects of general public interest."

The argument of defendant is that the first of these exceptions makes the purpose of the picketers determinative as to the right to picket, thus offending the equal protection requirement of the fourteenth amendment. We do not read this exception as making the existence of a labor dispute the qualifying factor. Rather it is the relatedness of the dispute to the fact of use of the home as a place of employment that is controlling. Borrowed

from the Hawaii statute,[32] this is a realistic recognition that a home can be something other or more than just a home. The apparent legislative intent is to protect the home or residence as a home and residence, and permit picketing of a place of employment regardless of whether or not it is located in a residential property. Where the householder makes his home or residence a place of employment for someone else, for as long as it is such place of employment, he waives the protection of the ordinance as to disputes related to such fact and place of employment. Where a householder employs a maid or building service workers, in the event of dispute, the only place such employees could exercise the right to picket, that would have any relatedness to the controversy, is where they were employed. Where a homeowner employs a carpenter, painter or electrician to repair or remodel the premises, as to any employment-related dispute, the place of employment is the only possible focus for picket activity. Where an employer lives above the store or tavern, or operates and maintains his business out of his residence, as to his employees in any labor-related dispute, the place of business is the only focus or target at which picketing could be meaningfully directed. Where the home is, temporarily or permanently, a place of employment, to take from those involved in an employment-related or labor dispute the right to picket at the place of their employment would leave them no place to picket such employer. Since there would be no reasonable alternative place available in such dispute as to such

[32] Sec. 757-1, Hawaii Rev. Stats. **Picketing of residence or dwelling prohibited.** It shall be unlawful for any person to engage in picketing before or about the residence or dwelling place of any individual. Nothing herein shall be deemed to prohibit (1) the picketing in any lawful manner, during a labor dispute, of the place of employment involved in such labor dispute; or (2) the holding of a meeting or assembly on any premises commonly used for the discussion of subjects of general public interest."

employment, the ban on picketing a home-place of employment would very nearly be a ban on picketing the employer at all. We view the exception not as denying, but as assuring, equal protection by limiting the ban on picketing the home to picketing it as a home, and permitting picketing of it as a place of employment whenever it is also that.

The city of Wauwatosa set out through this ordinance to protect the tranquility and privacy, not of places of employment, but of the homes in which its people live. It had the right to do so in the way that it did, and it is the right to do so, not the questions of appropriate public policy involved, with which we deal. On the existence of a state authority to seek to protect the homes of the community, we find appropriate these words of Mr. Justice BLACK:

"Were the authority of government so trifling as to permit anyone with a complaint to have the vast power to do anything he pleased, wherever he pleased, and whenever he pleased, our customs and our habits of conduct, social, political, economic, ethical, and religious would all be wiped out, . . . And perhaps worse than all other changes, homes, the sacred retreat to which families repair for their privacy and their daily way of living, would have to have their doors thrown open to all who desired to convert the occupants to new views, new morals, and a new way of life. Men and women who hold public office would be compelled, simply because they did hold public office, to lose the comforts and privacy of an unpicketed home. I believe that our constitution, written for the ages, to endure except as changed in the manner it provides, did not create a government with such monumental weaknesses. . . ." [33]

We hold that the Wauwatosa ordinance 9.19 is a valid exercise of the governmental power of the city of Wauwatosa and a constitutionally valid ordinance.

*By the Court.*—Judgment affirmed.

[33] Mr. Justice BLACK, concurring opinion, *Gregory v. Chicago, supra,* at page 125.