ESTADO LIBRE ASOCIADO DE PUERTO RICO Y OTROS, demandantes y apelados, *v.* HERMANDAD DE EMPLEADOS DEL NEGOCIADO DE SEGURIDAD DE EMPLEOS Y OTROS, demandados y apelantes.

*Número:* O-75-407    *Resuelto:* 3 de diciembre de 1975

*Manuel E. Moraza Choisne* y *Javier Rosa Silva,* abogados de los apelantes; *Miriam Naveira de Rodón, Procuradora General,* y *Mario L. Paniagua, Procurador General Auxiliar,* abogados de los apelados.

EL JUEZ PRESIDENTE SEÑOR TRÍAS MONGE emitió la opinión del Tribunal.

Los derechos y deberes de los seres humanos no constituyen usualmente imperios de fronteras precisas e inmutables. Chocan a menudo entre sí, por el contrario, e importa definir sus lindes y efectuar acomodos, situación a situación, conforme a los postulados y valores de una sociedad cambiante. El caso presente ilustra un ejemplo de las posibilidades de conflicto entre el derecho a la libre expresión, junto a otras libertades, y el derecho a que se proteja a los individuos contra ataques abusivos a su vida privada o familiar. La controversia se da en el contexto de un piquete frente al hogar de un funcionario público.

La apelante, Hermandad de Empleados del Negociado de Seguridad de Empleos, es una agrupación de empleados públicos del Departamento del Trabajo de Puerto Rico y los coape-

lantes son miembros de la Hermandad. Desde hace cierto tiempo, la Hermandad ha venido solicitando del Secretario del Trabajo, Dr. Silva Recio, que negocie colectivamente con ella. El Secretario del Trabajo le comunicó a la Hermandad y su directiva que no existe autoridad en ley para acordar tal convenio. En consecuencia, los apelantes les remitieron una comunicación a sus miembros para que en determinado día se personaran en la residencia del Dr. Silva Recio para llevar a cabo allí una protesta mediante piquetes.

El señor Secretario del Trabajo tiene constituido su hogar en una urbanización relativamente lejana a la sede del Departamento que encabeza. Convive allí con su esposa, dos hijas, de 10 y 14 años de edad y un varón de 17. Conforme a las conclusiones de hecho del tribunal de instancia, a la hora señalada llegaron varios automóviles, sonando sus bocinas. Los ocupantes, alrededor de treinta, se bajaron y comenzaron a caminar por la acera frente a la residencia del señor Secretario, portando cartelones. Utilizaron a la vez altoparlantes para hacer manifestaciones alusivas al señor Secretario, repetidas a coro. El ruido de los altoparlantes y de las personas en el piquete, así como su actitud militante, creó alarma en la residencia del Dr. Silva Recio y en las de sus vecinos. Se alteró sustancialmente el sosiego del vecindario y el ritmo de trabajo del referido funcionario público, quien se vio impedido de realizar labores oficiales que necesitaba cumplir dicha noche. El Dr. Silva Recio, preocupado por las expresiones de los manifestantes de que regresarían al día siguiente, optó finalmente por abandonar su residencia junto a sus familiares, trasladándose al hogar de unos parientes.

En atención a estos hechos, el tribunal de instancia declaró con lugar la solicitud de *Injunction* Preliminar y Permanente radicada por los apelados—se había dictado antes una Orden de Entredicho Provisional—y ordenó a la Hermandad y a su directiva "que se abstengan de incitar a piquetear o piquetear la residencia particular del demandante, Dr. Luis F. Silva

Recio, o en cualquier otra forma y manera, menoscabar o invadir la privacidad o propiedad privada y particular de éste y su familia, o alterar la paz y tranquilidad de éstos en su residencia privada. ..."

Se apela de esta sentencia a base de que constituye una violación a la libertad de expresión y asamblea.

Examinemos las raíces de los derechos aquí en pugna para luego proceder al análisis y ponderación de los intereses en juego.

El derecho a la protección de la vida privada o familiar —el derecho a la intimidad—tiene un historial distinto en Puerto Rico a su evolución en Estados Unidos. Dicho derecho adquiere rango constitucional en Puerto Rico mucho más temprano que en la Unión Americana. La Constitución del Estado Libre Asociado de Puerto Rico dispone desde 1952 que "Toda persona tiene derecho a protección de ley contra ataques abusivos a su honra, a su reputación y a su vida privada o familiar." (Art. II, Sec. 8). Esta disposición es una copia exacta del Art. V de la Declaración Americana de los Derechos y Deberes del Hombre, *La Nueva Constitución de Puerto Rico*, Ed. U.P.R. 1954, pág. 236, y entronca también con el Art. 12 de la Declaración Universal de los Derechos del Hombre, que dispone que:

"Nadie será objeto de ingerencia arbitraria en su vida privada, su familia, su domicilio o su correspondencia, ni de ataques a su honra o a su reputación. Toda persona tiene derecho a la protección de la ley contra tales ingerencias o ataques." (*Op. cit.*, 246.)

El reconocimiento del derecho a la intimidad en la Constitución de Puerto Rico obedeció básicamente a dos factores. Se estaba respondiendo, en primer término, a un concepto del individuo hondamente arraigado en nuestra cultura. Para un análisis detallado de las diferencias al respecto en los sistemas de valores de Latinoamérica y Estados Unidos, véanse: Wells, Henry, *La Modernización de Puerto Rico*, Ed. U.P.R. (tra-

ducción), 1972, pág. 21 *et seq.*; René de Visme Williamson, Culture and Policy: *The United States and the Hispanic World*, Univ. of Tenn. Press, 1949, pág. 9.

En segundo término, se quería formular una Carta de Derechos de factura más ancha que la tradicional, que recogiese el sentir común de culturas diversas sobre nuevas categorías de derechos. De ahí que la Declaración Universal de los Derechos del Hombre y la Declaración Americana de los Derechos y Deberes del Hombre ejerciesen una influencia tan significativa en la redacción de nuestra Carta de Derechos.

La Comisión sobre la Carta de Derechos subrayó la importancia y amplitud de la Sec. 8 del Art. II de nuestra Constitución, expresando en su informe a la Convención Constituyente que:

"La protección contra ataques a la honra, reputación y vida privada constituye también un principio que complementa el concepto de la dignidad humana mantenido en esta constitución. Se trata de la inviolabilidad personal en su forma más completa y amplia. El honor y la intimidad son valores del individuo que merecen protección cabal, no sólo frente a atentados provenientes de otros particulares, sino también contra ingerencias abusivas de las autoridades. . . ." (4 *Diario de Sesiones de la Convención Constituyente,* pág. 2566.)

■ En *González* v. *Ramírez Cuerda,* 88 D.P.R. 125, 133 (1963), y en *Alberio Quiñones* v. *E.L.A.,* 90 D.P.R. 812, 816 (1964) resolvimos que la Sec. 8 del Art. II opera *ex proprio vigore,* sin que se necesite ley que la complemente.[1] En casos posteriores se ha destacado el alto sitial que disfruta el derecho al sosiego del hogar en la escala de valores del pueblo puertorriqueño. *Torres* v. *Rodríguez,* 101 D.P.R. 177,

---

[1] Se ha concebido en ocasiones que una disposición de cosecha anterior, el Art. 277 del Código de Enjuiciamiento Civil de 1933, 32 L.P.R.A. sec. 2761, es utilizable en ciertas circunstancias para proteger el derecho a la intimidad. *Infante* v. *Leith,* 85 D.P.R. 26 (1962). A la luz de las conclusiones a que se llega en esta opinión consideramos innecesario analizar su aplicación a situaciones como la presente.

178 (1973); *Sucn. de Victoria* v. *Iglesia Pentecostal*, 102 D.P.R. 20 (1974). En este último caso expresamos:

"El vértigo de la vida moderna deja libres muy pocos momentos para la reflexión sin la cual no habrá un cabal entendimiento de las libertades. Unicamente el hogar brinda esos momentos de serenidad en que además de partir el pan con los suyos pueda el hombre encauzar su existencia y la de su familia entre lo conocido y el arcano que nos ofrece la vida. Sin esas oportunidades para la serenidad y la reflexión que van reduciéndose paulatinamente, ha dicho el Juez Frankfurter, la libertad de pensamiento se torna en burla, y sin libertad de pensamiento no puede existir una sociedad libre. No concebimos derecho de posición preferente a la libertad de estar y sentirse tranquilo en su casa."

No nos ha tocado hasta ahora enfrentarnos a la tarea de determinar el peso relativo de la libertad de expresión y el derecho a la intimidad en las circunstancias específicas que presenta este caso.

Aunque por ruta diversa, aspectos del derecho a la protección de la vida privada y familiar han alcanzado rango constitucional en Estados Unidos, después de una evolución lenta, pero firme. Tal derecho es en sus comienzos simple ramal del derecho de daños. Warren and Brandeis, *The Right to Privacy*, 4 Harv. L. Rev. 193 (1890); 1 Harper and James, *The Law of Torts*, sec. 9.5 *et seq.*; Prosser, *Handbook of the Law of Torts*, 4ª ed., 1971, pág. 802 *et seq.* Es a partir de 1965 que comienza a recibir reconocimiento constitucional en varias situaciones, justificándosele como efluvio de la primera, cuarta, quinta y decimocuarta enmiendas. *Griswold* v. *Connecticut*, 381 U.S. 479, 483–486 (1965); *Stanley* v. *Georgia*, 394 U.S. 557 (1969); *Eisenstadt* v. *Baird*, 405 U.S. 438 (1972); *Roe* v. *Wade*, 410 U.S. 113 (1973). Aunque en *Gregory* v. *Chicago*, 394 U.S. 111 (1969), la acción tuvo como trasfondo el piquete del hogar de un alcalde, el Tribunal Supremo de los Estados Unidos no ha tenido ocasión de expresarse sobre el problema específico que nos ocupa. Comment,

*Picketers at the Doorstep,* 9 Harv. Civ. Rights—Civ. Lib. L. Rev. 95, 100 (1974). En *Police Dept. of the City of Chicago* v. *Mosley,* 408 U.S. 92 (1972) se anuló una ordenanza que prohibía piquetear, dentro de 150 pies de una escuela, pero la decisión se fundó en la igual protección de las leyes, ya que la ordenanza permitía los piquetes si se tratase de una disputa obrera.

Otros tribunales estadounidenses, así como muchas asambleas legislativas y dos distinguidos jueces del Tribunal Supremo de Estados Unidos, se han pronunciado sobre el problema del piquete residencial. Dieciséis estados han aprobado legislación prohibiendo o reglamentando la utilización del piquete residencial. *Picketers at the Doorstep,* supra, nota 46, págs. 102–103. En Hawaii, por ejemplo, se dispone: "It shall be unlawful for any person to engage in picketing before or about the residence or dwelling place of any individual. Nothing herein shall be deemed to prohibit (1) the picketing in any lawful manner, during a labor dispute of the place of employment involved in such labor dispute; or (2) the holding of a meeting or assembly in any premises used for the discussion of subjects of general public interest." Rev. Laws Hawaii, sec. 300-2 (1965).

Las decisiones de los tribunales norteamericanos sobre la validez del piquete residencial en distintas circunstancias varían considerablemente. En *Flores* v. *Denver,* 220 P.2d 373 (Colo. 1950), se revocó la condena de diversas personas que habían piqueteado pacíficamente la residencia del Gobernador de Colorado. En *State* v. *Anonymous,* 274 A.2d 897 (Conn. 1970), se permitió piquetear la residencia del jefe de una agencia del estado. Del otro lado, en *City of Wauwatosa* v. *King,* 182 N.W.2d 530 (Wis. 1971), en que se estaba piqueteando el hogar de los miembros de la Junta Escolar, se validó una ordenanza que prohibía piquetear el hogar de cualquier individuo. Al mismo efecto: *García* v. *Gray,* 507 F.2d 539 (10th Cir. 1974); *City of Brookfield* v. *Groppi,* 184

N.W.2d 97 (Wis. 1971). Para casos ilustrativos de la variedad de contextos en que puede darse el piquete residencial y el consiguiente peligro en dictar pautas muy generales en este campo, véanse: *Annemberg* v. *So. Calif. District Council of Laborers*, 113 Cal. Rptr. 519 (1974); *Tassin* v. *Local 832, National Union of Police Officers of the AFL-CIO*, 311 So.2d 591 (La. 1975).

Existe diversidad de criterios también en la doctrina norteamericana. Kamin estima que "In the constitutional value scale, the quiet enjoyment and privacy of residential premises—even of the privately-owned homes of public officials—merits a higher priority than freedom of speech. A state or a municipality encounters no constitutional obstacle in drastically regulating picketing, whether labor or political, in residential areas, or even in prohibiting such activities." Kamin, *Residential Picketing and the First Amendment*, 61 Nw. U.L. Rev. 177, 182–183 (1966). Otros autores coinciden con este punto de vista; otros se oponen a él; y otros consideran que debe particularizarse en lo posible y sopesar los intereses envueltos caso a caso. Véanse: Comment, *Picketing the Homes of Public Officials*, 34 U. Chi. L. Rev. 106 (1966); Haiman, *Speech v. Privacy: Is there a Right not to be Spoken to?*, 67 Nw. U.L. Rev. 153 (1972); Parker, *A Definition of Privacy*, 27 Rutgers L. Rev. 275 (1974); Comment, *Picketers at the Doorstep*, 9 Harv. Civ. Rights—Civ. Lib. L. Rev. 95 (1974).

Los jueces que se han expresado sobre este particular fueron por décadas notables defensores de los derechos civiles. En su opinión concurrente en *Gregory* v. *Chicago*, 394 U.S. 111, 118, 124–126 (1964), a la que se unió el Juez Douglas, se expresó así el Juez Hugo Black:

". . . Es claro, sin embargo, que nuestra Constitución no desarma a los estados y otras unidades gubernamentales de su facultad de aprobar leyes para proteger al público de conducta amenazante y tumultuosa que perturbe la tranquilidad de sus

hogares, adonde puedan escapar del bullicio, del mundo de los negocios y la política, o el sosiego de aquellos edificios públicos y de otra índole que requieran tranquilidad y quietud para el desempeño de sus funciones, tales como cortes, bibliotecas, escuelas y hospitales.

. . . . . . . .

Si la autoridad del gobierno al respecto fuese tan insignificante que cualquier persona con una queja que expresar tuviese el vasto poder de hacer lo que quisiere, donde y cuando lo deseare, desaparecerían nuestras costumbres y hábitos, sociales, políticos, económicos, éticos y religiosos de conducta, convirtiéndose tan solo en reliquias de un pasado perdido pero no olvidado . . . los hogares, el retiro sagrado para la preservación de la intimidad y el modo diario de vivir de las familias, tendrían que abrir sus puertas a todos los que deseasen convertir a sus ocupantes a nuevos puntos de vista, a una nueva moral y a un nuevo modo de vida. Los hombres y mujeres que desempeñasen cargos públicos se verían obligados, simplemente por dedicarse a tal tarea, a perder las comodidades e intimidad de un hogar no expuesto a piquetes. Creo que nuestra Constitución, escrita para todas las épocas, sin que pueda alterarse excepto en la forma que en ella se provee, no estableció un convenio con debilidades tan monumentales. La expresión y la prensa deben, por supuesto, ser libres para que los asuntos públicos puedan discutirse impunemente. Los piquetes y las manifestaciones, sin embargo, pueden regularse como cualquier otro tipo de conducta humana. Creo que los hogares, a veces la última ciudadela de los fatigados, los abrumados y los enfermos, deben protegerse por el gobierno de manifestantes ruidosos, tumultuosos y amenazantes encaminados a poblar la mente del hombre, mujeres y niños con el peligro de lo desconocido."

En la propia cuna del Derecho Común, el dilema que en la actualidad acosa a los tribunales norteamericanos se ha resuelto por disposición estatutaria. El Parlamento inglés dispuso en la Trade Union and Labour Relations Act 1974 (c. 52) lo siguiente:

"Uno o más individuos podrán legalmente, en el curso de una disputa obrera, personarse en o cerca de

a) un lugar donde otro individuo trabaje o tenga su negocio;

b) cualquier otro sitio donde otra persona pueda estar, *siempre que dicho lugar no sea el sitio de su residencia* solamente con el fin de obtener o comunicar de modo pacífico, información o de persuadir pacíficamente a alguna persona a trabajar o a abstenerse de trabajar." Halsbury's *Statutes of England,* 3ª ed. Current Statutes Service, pág. 985. (Énfasis nuestro.)

Esta protección de la residencia privada aun contra el piquete pacífico comienza en 1971. 37 Halsbury's *Statutes of England,* 3ª ed., pág. 986.

En el Derecho Civil y en otros sistemas de derecho la intimidad del hogar ha recibido también protección creciente. Wagner, *The Development of the Theory of the Right to Privacy in France,* 1971 Wash. U.L.Q. 45. En países de tradiciones jurídicas muy dispares el derecho a la intimidad ha logrado, como en Puerto Rico, rango constitucional. Para algunos ejemplos aislados, consúltense las constituciones del Ecuador (Art. 28(4) de la Constitución de 1967); de Egipto (Arts. 9 y 45 de la Constitución de 1972); Ghana (Art. 12c, cap. IV, Constitución de 1969); y Gambia, Art. 13c, cap. XIII, 1971, Blaustein and Flauz, *Constitutions of the Countries of the World.*

De todo lo anterior se desprenden varias conclusiones. El derecho a la intimidad tiene firme base en la valorativa puertorriqueña. Se apoya en dos fuertes pilares: la naturaleza de nuestra propia cultura y el creciente reconocimiento internacional de este interés. La Sec. 8 del Art. II de nuestra Constitución demuestra cómo puede forjarse un derecho puertorriqueño fiel a nuestra identidad pero no provinciano, respetuoso de nuestras propias tradiciones y a la vez abierto a los desarrollos en otros países que se adapten a sus realidades.

Lo expuesto hasta ahora, sin embargo, no resuelve de por sí la cuestión específica ante nos. Lo que indica es que el derecho a la intimidad goza de un altísimo sitial en nuestra escala de valores, pero lo mismo puede decirse ciertamente del

derecho a la libre expresión y de otras libertades. Véanse: *Mari Bras* v. *Casañas*, 96 D.P.R. 15 (1968); *Aponte Martínez* v. *Lugo*, 100 D.P.R. 282 (1971). En muchas situaciones el derecho a la protección de la vida privada o familiar debe prevalecer sobre dichas libertades. En otras puede ocurrir a la inversa. Analicemos la situación concreta a que nos enfrentamos en esta instancia.

Los argumentos usualmente aducidos a favor de permitir el piquete residencial pacífico en un caso como el de autos son fundamentalmente los siguientes. El piquete frente al hogar de un funcionario público puede ser mucho más eficaz que de realizarse en los alrededores de su sitio oficial de trabajo. La presión psicológica es mucho mayor. Se obtiene normalmente más publicidad, tanto al comunicársele la queja al vecindario inmediato del servidor público como al acrecentarse la posibilidad de acceso a los medios noticiosos. Las calles han constituido, además, un tradicional foro público en muchas circunstancias para la expresión de las ideas. Podría, finalmente, argumentarse que el funcionario público debe estar más expuesto a quejas y protestas que un funcionario privado.

El piquete residencial de un funcionario público en las circunstancias de este caso rebasa, en cambio, los extensos límites de las libertades de expresión, petición y asamblea. La persona contra quien se protesta se convierte en un ente cautivo. Se le coarta su derecho a la tranquilidad y al descanso. Se le acosa. Se le inquieta. Se altera no solamente el sosiego de su hogar, sino el de sus vecinos, no envueltos en la controversia. Ocurre esto, además, a pesar de que lo que le interesaba expresar la Hermandad podía comunicarlo en piquete pacífico frente a las oficinas del Departamento del Trabajo.

■ Resolvemos que en esta situación los costos psíquicos a los ocupantes de la residencia y a sus vecinos exceden los beneficios derivables por la Hermandad. Los servidores públicos no tienen menos derecho a la tranquilidad de su hogar que

los ciudadanos privados. Habrá casos en que por variar algunas de las circunstancias y el peso relativo de los intereses envueltos será necesaria la regulación del piquete y no su prohibición absoluta.

■ Respecto al remedio utilizado, el entredicho preliminar dictado en este caso se justifica plenamente, a la luz de las circunstancias descritas, en que existía un sitio alterno para expresarse eficazmente y en que el piquete se condujo en modo desordenado y amenazante. No era imprescindible recurrir a sanciones criminales o civiles de otro género para atender las violaciones de ley alegadamente cometidas por algunos manifestantes. Era permisible el *injunction.*

*Se confirmará la sentencia dictada por el Tribunal Superior.*

Los Jueces Asociados, Señores Rigau y Díaz Cruz, están conformes y además el Señor Juez Rigau emite opinión concurrente con la cual concurre el Juez Asociado, Señor Díaz Cruz. El Juez Asociado, Señor Martín, concurre en el resultado.

—O—

Opinión concurrente del Juez Asociado Señor Rigau con la cual concurre el Juez Asociado Señor Díaz Cruz.

San Juan, Puerto Rico, a 3 de diciembre de 1975.

Concurro con la opinión del Tribunal. Estoy completamente de acuerdo en que procede confirmar la sentencia del tribunal de instancia mediante la cual se prohibió a los demandados piquetear la residencia del señor Secretario del Trabajo.

En adición a lo anterior, estimo conveniente precisar algunos conceptos dada la importancia de los valores aquí concernidos. Especialmente esto es así, ya que se trata de un fenómeno—el piquete laboral—que sin duda ha de recurrir con frecuencia en nuestro medio y que, por ello, mientras más

clara sea nuestra posición con más seguridad podrán actuar en el futuro las organizaciones obreras, el Gobierno, los abogados y los tribunales de instancia.

En esencia, se trata en este caso de un conflicto obrero-patronal. Los piquetes laborales son mecanismos que el Estado democrático liberal aceptó y protegió con el propósito de que las clases económicamente más débiles tuviesen maneras de luchar pacíficamente por sus intereses. Sin embargo, parece necesario aclarar ahora algunas cosas que al principio, seguramente debido al deseo de proteger esa actividad laboral, se confundieron un poco.

Hace ya más de una generación que el Tribunal Supremo de los Estados Unidos declaró inconstitucional una ley estatal y una ordenanza municipal que prohibían los piquetes pacíficos. [1] Se basó principalmente el tribunal en que mediante los piquetes se "diseminaba información" sobre una disputa obrera y que dichas disposiciones legislativas violaban la libertad de expresión garantizada por la Constitución de los Estados Unidos.

Creo necesario puntualizar que aunque la actividad de piquetear contenga algún elemento o propósito de diseminar información, ése no es su objetivo principal. Si lo fuera, bastaría con que los interesados pusiesen un anuncio en los periódicos, o emitiesen un comunicado de prensa, o celebrasen una conferencia con reporteros de la prensa y la televisión. Obviamente el piquete pacífico, aunque algo informa al que lo ve, tiene el propósito de protestar y de poner presión sicológica sobre el piqueteado. Así lo reconoció el propio Tribunal Supremo de los Estados Unidos, diez años después de sus decisiones en los citados casos de *Thornhill* v. *Alabama* y de *Carlson* v. *California*. En *Teamsters Union* v. *Hanke*, [2] expresó que "aunque los piquetes tienen algún ingrediente de comunicación

---

[1] *Thornhill* v. *Alabama*, 310 U.S. 88 (1940) y *Carlson* v. *California*, 310 U.S. 106 (1940), respectivamente.

[2] 339 U.S. 470, 474 (1950).

no se les puede equiparar dogmáticamente con la libertad de palabra protegida por la Constitución." Esa decisión y numerosas otras que le siguieron (³) colocaron a los piquetes en una perspectiva jurídica más realista. (⁴)

A diferencia de las motivaciones de lucro de las luchas obrero-patronales contemporáneas, el ejercicio de la libertad de expresión es una función humana de profundo contenido espiritual. Como dijimos en *Aponte Martínez* v. *Lugo*, 100 D.P.R. 282, 294 (1971), "No creemos que para el hombre civilizado la libertad de conciencia es menos importante que la libertad física." En el excelente estudio de derecho constitucional puertorriqueño titulado *La Nueva Constitución de Puerto Rico*, editorial de la U.P.R. (1954), se expresa a la pág. 205: "Entre las libertades individuales, la libertad de expresión es probablemente la más esencial una vez garantizado el derecho a la vida y libertad física." Allí se señala que la libertad de expresión tiene dos fines u objetivos. Por una parte, la protección de la persona como ser libre frente a los demás hombres y frente al Estado; y por otra parte, la preservación de la democracia pues establece la condición indispensable para la formación de opinión pública, sobre cuya base está fundado el gobierno democrático.

---

(³) *Giboney* v. *Empire Storage Co.*, 336 U.S. 490 (1949); *Building Service Union* v. *Gazzam*, 339 U.S. 532 (1950); *Hughes* v. *Superior Court*, 339 U.S. 460 (1950); *Carpenters Union* v. *Ritter's Cafe*, 315 U.S. 722, 728 (1942).

(⁴) El transcurso del tiempo ha ido desvaneciendo la inocencia de los jueces. Véanse las siguientes expresiones: "El movimiento obrero ha llegado a su mayoridad y debe asumir las responsabilidades ordinarias de la vida." *Linn* v. *United Plant Workers of America*, 383 U.S. 53, 63 (1966). "La Ley Norris-La Guardia respondió a una situación totalmente diferente de la que existe hoy día." *Boys Markets* v. *Clerks Union*, 398 U.S. 235, 250 (1970) (Brennan). "No hay duda de que las relaciones obrero-patronales en las postrimerías del año 1970 no se desenvuelven en las mismas circunstancias en que lo hacían hace más de 30 años cuando se aprobaron la Ley Wagner en los Estados Unidos y la Ley Insular de Relaciones del Trabajo de 1938, y ni aun cuando se aprobó la vigente Ley de Relaciones del Trabajo de 1945." *U.T.I.E.R.* v. *J.R.T.*, 99 D.P.R. 512, 531 (1970).

Se reconoce en la citada obra que las libertades de reunión y petición se encuentran íntimamente ligadas a la libertad de expresión. Esto es así porque en muchos casos la libertad de palabra tiene sentido tan sólo conectada con la libertad de reunión. A menos que haya un auditorio presente ante el orador, la libertad de expresarse oralmente sería un derecho inútil. Sin embargo, como sabemos, estos derechos no son absolutos ya que en condiciones extremas pueden producir situaciones peligrosas para el mantenimiento del orden público o de la seguridad del Estado. En estos casos es preciso trazar una línea entre el ejercicio lícito y el ejercicio ilícito de esos derechos. La clásica regla de "peligro claro y presente" ha servido a los tribunales para resolver, caso a caso, tan espinosa cuestión.

Nuestra disposición constitucional sobre el particular dispone que:

"No se aprobará ley alguna que restrinja la libertad de palabra o de prensa o el derecho del pueblo a reunirse en asamblea pacífica y a pedir al gobierno la reparación de agravios."— Constitución de Puerto Rico, Art. II, Sec. 4.

Dicha disposición, además de su texto claro tiene un bagaje histórico de valor incalculable. La propia Comisión de Carta de Derechos de la Convención Constituyente de Puerto Rico expresó que:

"Esta sección [la sección 4 de nuestra Carta de Derechos] corresponde a las restantes disposiciones de la enmienda primera en la Constitución federal e incorpora a nuestra Constitución todo el derecho históricamente establecido con relación a la libertad de palabra, de prensa, de reunión y de petición. Las secciones 3 y 4 cubren el ámbito general de la libertad de conciencia, de pensamiento, de expresión, y las actividades propias para ejercitar a plenitud dentro de la más dilatada libertad la totalidad de estos derechos." [5]

---

[5] *Diario de Sesiones de la Convención Constituyente de Puerto Rico*, ed. Equity de 1961, Tomo 4, pág. 2564.

Como señalamos en *Aponte*, supra, a la pág. 291, esas palabras están llenas de significado. Dicho derecho histórico comprende, además de la jurisprudencia de los Tribunales de apelación de los Estados Unidos, lo mejor de la historia política y constitucional de dicho país e incluye también lo más valioso del pensamiento y de la tradición libertaria occidental.

El piquete cumple propiamente su función de protesta pacífica y de información pública frente a la fábrica o el lugar de trabajo, pero cuando se traslada al hogar del ejecutivo privado o público deja de ser una función lícita para convertirse en un acoso personal que no está protegido por la Constitución. Se torna en una alteración injustificada de la paz del vecindario, de su víctima y de su familia.

Como hemos indicado, el piquete laboral pacífico tiene su función lícita frente al lugar de trabajo. Esto incluye establecimientos privados y públicos. Pero, como estamos resolviendo, no puede trasladarse la contienda al hogar de las partes. Sin embargo, es posible prever casos en los cuales el lugar de trabajo sea también el hogar de la persona que se interesa piquetear. Sería deseable una reglamentación legislativa sobre el particular, pero en el interín, debemos reconocer que pueden surgir situaciones que requieran una expresión judicial sobre el particular.

Por ejemplo, en esos casos en los cuales el hogar sea a la vez el lugar del trabajo, el piquete podría ser permitido solamente durante horas laborables. Así se permitiría la expresión de la protesta laboral mediante el piquete y también el descanso y la tranquilidad del hogar en las horas no laborables. También es concebible que en esos casos el piquete se haya de llevar a cabo a una distancia razonable del edificio hogar-oficina u hogar-taller, de manera que la ansiedad y el desasosiego —con frecuencia, el peligro—que esas situaciones crean no graviten excesivamente sobre los miembros de la familia. Uno de los valores más preciados de la vida civilizada, la tranqui-

lidad del hogar, es un valor muy superior a los que pueda tener el de la lucha sindical contemporánea.