LUIS BONILLA MEDINA y OTROS, demandantes y recurrentes, *v.* PARTIDO NUEVO PROGRESISTA, demandado y recurrido.

*Número:* CE-94-543    *Resuelto:* 13 de marzo de 1996

*Juan M. Ponce Fantauzzi,* del *Bufete Ponce Fantauzzi,* abogado de los recurrentes; *Max Pérez Preston,* abogado del recurrido.

EL JUEZ ASOCIADO SEÑOR HERNÁNDEZ DENTON emitió la opinión del Tribunal.

En el caso de epígrafe nos corresponde establecer un delicado balance entre dos (2) derechos de la más alta jerarquía constitucional: la libertad de expresión, en una situación en que la expresión impugnada es una expresión política, y el derecho a la intimidad, en su vertiente del derecho a la propia imagen.

Acude ante nos Luis Bonilla Medina y solicita la revocación de la sentencia dictada por el Tribunal Superior, Sala de San Juan, que desestimó su demanda por daños y perjuicios por la utilización sin autorización de una fotografía suya en un anuncio del Partido Nuevo Progresista (en adelante P.N.P.). Por entender que en el caso de epígrafe el derecho a la intimidad del recurrente, en su vertiente del derecho a la propia imagen, debe ceder ante la libertad de expresión política del entonces candidato a la gobernación Dr. Pedro J. Rosselló González, confirmamos la sentencia que desestimó la demanda incoada.

## I

La demanda en el caso de autos surge por motivo de la publicación de una fotografía del recurrente, Luis Bonilla Medina, en un anuncio del P.N.P. publicado en el periódico *El Nuevo Día* el 30 de marzo de 1992, en el cual se le daba promoción a ciertas caminatas que llevaría a cabo dicho partido político como parte de la campaña realizada para las elecciones generales de 1992. La fotografía muestra al recurrente en el balcón de su residencia, que colinda con la acera, estrechándole la mano al entonces candidato a la gobernación por el P.N.P., Dr. Pedro J. Rosselló González. En la parte superior de la fotografía aparece el estribillo "Rosselló Con la Fuerza del Pueblo" y en la parte inferior aparece un itinerario titulado "Ciclo de visitas a pueblos" seguido por la frase "...por un nuevo comienzo". Apéndice, pág. 26.

Luis Bonilla Medina, su esposa, María Vázquez Avilés, y la sociedad legal de gananciales compuesta por ambos presentaron una demanda por daños y perjuicios contra el Dr. Pedro J. Rosselló González, el P.N.P., el Lcdo. Marcos Morell, en su capacidad de Secretario del P.N.P., y otros, en la cual alegaron que la publicación de la fotografía de Bonilla Medina sin su consentimiento constituyó una violación de su derecho a la intimidad. Alegaron que los demandados publicaron la foto "con el velado propósito" de transmitir "el mensaje subyacente de que el demandante había ingresado al Partido Nuevo Progresista" (Apéndice, pág. 22) y que por motivo de su publicación, habían sido objeto de insultos por parte de personas en su comunidad "que entendieron que éstos habían [abandonado] sus principios". Íd. Señalaron que Bonilla Medina es conocido en la comunidad de Isabela y en los pueblos aledaños como miembro del Partido Popular Democrático, "ya que fue uno de los fundadores de dicha colectividad en la comarca". Íd.

Los demandados presentaron una moción de sentencia sumaria, en la cual alegaron que no existía controversia alguna sobre los hechos materiales del caso y que la demanda no cumplía con los requisitos de una causa de acción por libelo, por lo que debía ser desestimada. Los demandantes presentaron un escrito de oposición. Alegaron, en síntesis, que su causa de acción era por violación al derecho constitucional a la intimidad, según reconocida en *Colón v. Romero Barceló*, 112 D.P.R. 573 (1982), y no una causa de acción por libelo, por lo que no procedía dictar una sentencia sumaria que desestimara la demanda.

El Tribunal Superior dictó una sentencia sumaria contra Bonilla Medina. Desestimó su demanda por entender que, distinto a *Colón v. Romero Barceló*, supra, Bonilla Medina renunció a su derecho a la intimidad al extenderle la mano al doctor Rosselló. Concluyó, además, que "los anuncios políticos están protegidos por el derecho de libertad de expresión según garantizado por nuestra Constitución y la [Primera Enmienda] de la Constitución de los Estados Unidos". (Citas omitidas.) Apéndice, pág. 24.

Inconformes con dicha determinación, acuden ante nos Bonilla Medina y los restantes demandantes y solicitan la revocación de la sentencia dictada por el tribunal de instancia. En síntesis, alegan que erró el tribunal al determinar que el recurrente renunció a su derecho a la intimidad al haberle estrechado la mano al doctor Rosselló. Por entender que en el caso de epígrafe la libertad de expresión tiene mayor jerarquía que el derecho a la intimidad de Bonilla Medina, confirmamos la sentencia del tribunal de instancia que desestimó la reclamación incoada.

## II

La Sec. 4 del Art. II de la Constitución del Estado Libre Asociado de Puerto Rico, L.P.R.A., Tomo 1, ed. 1982, pág. 265, reconoce la libertad de expresión como uno de los

valores de más alta jerarquía dentro de nuestro ordenamiento constitucional:

> No se aprobará ley alguna que restrinja la libertad de palabra o el derecho del pueblo a reunirse en asamblea pacífica y a pedir al gobierno la reparación de agravios.

■ El Informe de la Comisión de la Carta de Derechos de la Convención Constituyente reconoció que estos derechos "cubren el ámbito general de la libertad de conciencia, de pensamiento, de expresión, y las actividades propias para ejercitar a plenitud dentro de la más dilatada libertad la totalidad de estos derechos". 4 Diario de Sesiones de la Convención Constituyente 2564 (1951).

■ La libertad de expresión es una "raíz indiscutible del sistema democrático de gobierno". *Mari Bras v. Casañas*, 96 D.P.R. 15, 20–21 (1968). Véase, además, *Coss y U.P.R. v. C.E.E.*, 137 D.P.R. 877 (1995). A esos efectos, hemos citado con aprobación las expresiones del Tribunal Supremo federal en *Mills v. Alabama*, 384 U.S. 214 (1966), en torno a la Primera Enmienda de la Constitución federal, que garantiza la libertad de expresión:

> "No empece las diversas interpretaciones sobre la Enmienda Primera, prácticamente la opinión es unánime al efecto de que su propósito principal es proteger la libre discusión sobre los asuntos de gobierno. Por supuesto esto incluye la discusión sobre candidaturas, estructuras y formas de gobierno, la forma en que se conduce o debe conducirse la gestión gubernamental, y todo lo relacionado con los procesos políticos." *Mari Bras v. Casañas*, supra, pág. 22.

La expresión política debe recibir el más alto grado de protección constitucional en nuestra sociedad pluralista. En esta comunidad la toma de decisiones se realiza de forma democrática, de manera que aflore la voluntad de la mayoría al mismo tiempo que se respetan los derechos de las minorías. Esto supone el libre intercambio de ideas, opiniones e información sobre los procesos gubernamentales y políticos.

En múltiples ocasiones el más alto foro federal ha enfatizado la preeminencia de la expresión política dentro de la jerarquía constitucional de protección a la libertad de expresión:

> ...la Primera Enmienda fue "diseñada con el propósito de asegurar el libre intercambio de ideas para promover los cambios políticos y sociales deseados por el pueblo", *Roth v. United States*, 354 U.S. 476 (1957)], *por lo cual no puede dudarse que dicha garantía constitucional tiene su más completa e importante aplicación en el manejo de las campañas de aspirantes a puestos políticos.* (Traducción y énfasis nuestros.) *Monitor Patriot Co. v. Roy*, 401 U.S. 265, 271–272 (1971). Véase, además, *Buckley v. Valeo*, 424 U.S. 1, 14–15 (1976).

No obstante, hemos expresado anteriormente que el valor superior otorgado a la libertad de expresión en nuestro ordenamiento constitucional "no supone una irrestricción absoluta, de forma que no pueda subordinarse a otros intereses cuando la necesidad y conveniencia públicas lo requieran". *Mari Bras v. Casañas*, supra, pág. 21.

El caso de epígrafe presenta un ejemplo de las posibilidades de conflicto entre el derecho a la libre expresión y el derecho a la intimidad. Véase *E.L.A. v. Hermandad de Empleados*, 104 D.P.R. 436 (1975). El reclamo de Bonilla Medina se fundamenta en la causa de acción en daños y perjuicios, al amparo del Art. 1802 del Código Civil, 31 L.P.R.A. sec. 5141, reconocida en *Colón v. Romero Barceló*, supra, por violación al derecho a la intimidad en su vertiente del derecho a la propia imagen.

En aquella ocasión revocamos la sentencia del tribunal de instancia que desestimó la demanda de la viuda y los hijos del Sr. Tulio Rivera Lugo contra el ex gobernador Carlos Romero Barceló y el "Comité Carlos 80" por la publicación de una fotografía grotesca del cadáver de su esposo y padre, quien fuera asesinado el 24 de septiembre de 1977, en un anuncio de televisión, tres (3) años después de su muerte.

Reconocimos el derecho a la propia imagen en nues-

tra jurisdicción fundamentándonos en "el carácter y primacía del derecho y protección a lo privado" garantizado por nuestra Constitución en las Secs. 1 y 8 de su Artículo II, L.P.R.A., Tomo 1. Según explicamos en *Colón v. Romero Barceló*, supra, citando a Santos Briz, "[e]n virtud de este derecho (a la propia imagen) toda persona puede oponerse a que se reproduzca su efigie o se obtengan pruebas fotográficas de la misma, por personas a quienes no haya concedido autorización expresa o tácita". *Colón v. Romero Barceló*, supra, pág. 578, citando a J. Santos Briz, *El Derecho de Daños*, Madrid, Ed. Rev. Der. Privado, 1963, págs. 178–179.

Señalamos, sin embargo, que se "considera admisible, sin perjuicio de otras causas de justificación, la publicación o la toma de fotografías en la esfera llamada de historia contemporánea (*aus dem Bereich der Zeitgeschichte*) no referida a la vida privada, o cuando reproduzcan reuniones, manifestaciones u otros actos públicos semejantes o sucesos o localidades públicos en los que la persona fotografiada sea una figura accesoria". *Colón v. Romero Barceló*, supra, pág. 578, citando a Santos Briz, *op. cit.* En estos casos, la doctrina civilista reconoce que el derecho a la propia imagen debe ceder ante el interés público de acceso a información.

Examinada la normativa pertinente, nos corresponde establecer un balance entre los intereses de la libre expresión del Dr. Pedro J. Rosselló González, que era candidato a la gobernación de Puerto Rico al momento de los hechos del caso de epígrafe, y los intereses de Bonilla Medina sobre su intimidad e imagen.

## III

Bonilla Medina alega que sufrió una violación del derecho a la intimidad, en su vertiente del derecho a la propia imagen, por la publicación de su fotografía sin su

consentimiento. En su moción en oposición a que se dictara una sentencia sumaria, expresamente rechazó que su causa de acción fuera por libelo o difamación.

Del expediente surge que la fotografía difundida por el P.N.P. fue tomada como parte de la celebración de una caminata en contra de las drogas mientras el Dr. Pedro Rosselló era candidato al puesto electivo más importante en nuestro país. Ésta se tomó mientras Rosselló González se encontraba en una acera pública frente al balcón de la residencia de Bonilla Medina, en un lugar a la vista del público en general. A la luz de estas circunstancias, el derecho a la intimidad de Bonilla Medina, en su vertiente del derecho a la propia imagen, debe ceder ante la libertad de expresión del entonces futuro candidato a la gobernación.

No cabe duda de que la fotografía fue utilizada como parte de una campaña política en un proceso eleccionario. En el anuncio donde ésta apareció se informaba a la ciudadanía el itinerario de visitas de la caminata del P.N.P. en ciertos pueblos de la Isla.

En el caso de epígrafe, distinto a *Colón v. Romero Barceló*, supra, se trata de una fotografía tomada en un evento de interés público y en un lugar a la vista del público en general en la que Bonilla Medina era una figura accesoria. Según señalamos en *Colón*, supra, la doctrina civilista del derecho a la propia imagen admite la publicación de fotografías tomadas en lugares o eventos públicos sin la autorización de la persona fotografiada cuando ésta sea una figura accesoria. La foto muestra al entonces candidato a la gobernación, Rosselló González, saludando a Bonilla Medina durante una caminata mientras otras personas observan. No se trata de la foto de una persona que goce de amplio reconocimiento en Puerto Rico. Bien pudo haber sido cualquier otro miembro de la comunidad estrechándole la mano a Rosselló González. En *Colón*, supra, la situación no era una de accesoriedad. La publicación impug-

nada era una foto grotesca del cadáver de una persona asesinada. Se trataba de una situación en que se intentó "capitalizar" a costa del dolor ajeno.

Bonilla Medina expresamente rechazó que su causa de acción fuera por libelo o difamación. Sin embargo, una de las alegaciones de la demanda es que la fotografía fue publicada con el "velado propósito" de dar la impresión de que el demandante apoyaba la candidatura del Dr. Pedro J. Rosselló González a la gobernación de Puerto Rico, lo cual era falso y dañino a su reputación. No podemos darle legitimidad al argumento a los efectos de que del mero estribillo de campaña "Rosselló Con la Fuerza del Pueblo" unido a la foto impugnada, en un anuncio que informaba el itinerario de toda una serie de caminatas, se desprende tal conclusión.

De ordinario, en una campaña para cualquier cargo electivo, tanto la prensa como el propio candidato toman fotografías de todos los eventos políticos y no es hasta que concluye la actividad que se seleccionan las que se van a utilizar en la campaña. En el momento de tomar la fotografía generalmente no se conoce si ésta va a ser seleccionada para ser publicada.

De reconocer una causa de acción en un caso como el de epígrafe, estaríamos imponiendo a los aspirantes políticos la obligación excesivamente onerosa de obtener un relevo de cada persona cuya foto aparezca publicada como parte de su campaña política. Ello tendría el efecto de coartar o "congelar" la expresión, situación que la Sección 4 del Artículo II de nuestra Constitución, *supra*, y la Primera Enmienda de la Constitución federal, *supra*, precisamente pretenden evitar.

No resolvemos aquí que toda expresión que se realice durante el proceso político esté protegida de manera absoluta. Tan sólo resolvemos que los hechos específicos ante nos justifican que la libertad de expresión del enton-

ces candidato a la gobernación de Puerto Rico prevalezca sobre la leve intromisión en la intimidad que pudo haber sufrido Bonilla Medina.

## IV

Señalan los recurrentes, además, que el tribunal de instancia no debió dictar una sentencia sumaria, pues a su entender existía una controversia sobre hechos esenciales a la causa de acción ejercitada. No tienen razón.

■ La Regla 36.2 de Procedimiento Civil, 32 L.P.R.A. Ap. III, permite que un demandado solicite en cualquier momento que se dicte sentencia sumaria a su favor sobre parte o la totalidad de la reclamación en su contra. Ésta procede si

> ... las alegaciones, ... deposiciones, contestaciones a interrogatorios y admisiones ofrecidas, en unión a las declaraciones juradas, si las hubiere, demostraren que no hay controversia real sustancial en cuanto a ningún hecho material y como cuestión de derecho debe dictarse sentencia sumaria a favor de la parte promovente. 32 L.P.R.A. Ap. III.

■ En caso de que exista una controversia en relación con los hechos, no procede dictar la sentencia sumaria y cualquier duda debe resolverse en contra de la parte promovente. *Cuadrado Lugo v. Santiago Rodríguez*, 126 D.P.R. 272 (1990). En *Méndez Arocho v. El Vocero de P.R.*, 130 D.P.R. 867, 874 (1992), expresamos:

> Este mecanismo procesal es especialmente deseable en aquellos casos en que se encuentra involucrada la libertad de expresión, pues la prolongación de estos pleitos puede tener un efecto paralizante o disuasivo (*chilling effect*) sobre el ejercicio de este derecho fundamental. Véanse: *Villanueva v. Hernández Class*, 128 D.P.R. 618 (1991); *Oliveras v. Paniagua Diez*, 115 D.P.R. 257 (1982); *García Cruz v. El Mundo, Inc.*, 108 D.P.R. 174, 182 (1978).

No estaba en controversia que la foto publicada fue tomada en un evento público, en un lugar que se encontraba a la vista del público en general; que Bonilla Medina era una figura accesoria, y que la foto fue utilizada como parte de una campaña política. Al aplicar la normativa anterior al caso de epígrafe, resolvemos que el tribunal de instancia actuó con corrección al determinar que no existían los hechos en controversia y al desestimar la demanda mediante una sentencia sumaria.

## V

Por último, los recurrentes impugnan la determinación del tribunal de instancia de imponerles honorarios por temeridad. Señalan que "[u]na reclamación judicial contra personas privadas por violarle su derecho a su integridad personal e imagen son derechos reconocidos en la Constitución, la jurisprudencia y los tratadistas", razón por la cual no se le debieron imponer honorarios por temeridad. Petición de *certiorari*, pág. 16. Les asiste la razón.

La Regla 44.1(d) de Procedimiento Civil dispone que "[e]n caso que cualquier parte haya procedido con temeridad, el tribunal deberá imponerle en su sentencia el pago de una suma por concepto de honorarios de abogado". 31 L.P.R.A. Ap. IV. El objetivo de la imposición de honorarios de abogados es penalizar al litigante que "por su terquedad, obstinación, contumacia e insistencia en una actitud desprovista de fundamentos, obligaba a la otra parte, innecesariamente, a asumir las molestias, gastos, trabajo e inconveniencias de un pleito". *Fernández v. San Juan Cement Co., Inc.*, 118 D.P.R. 713, 718 (1987). Véase *Soto v. Lugo*, 76 D.P.R. 444 (1954). Esta determinación descansa en la sana discreción del tribunal sentenciador. *Raoca Plumbing v. Trans World*, 114 D.P.R. 464 (1983). La partida de honorarios así concedida no se variará por un tribunal apelativo a menos que ésta sea excesiva, exigua o

constituya un abuso de discreción. *Ramírez v. Club Cala de Palmas*, 123 D.P.R. 339 (1989).

Al examinar la causa de acción ejercitada en el caso de epígrafe a la luz de las consideraciones anteriores, concluimos que Bonilla Medina no fue temerario al presentar la demanda; pues ya en *Colón v. Romero Barceló*, supra, se había reconocido una causa de acción por violación del derecho a la propia imagen fundamentada en el derecho a la intimidad.

Por los fundamentos antes expuestos, *se expide el auto y se confirma la determinación del tribunal de instancia que desestimó la demanda por daños y perjuicios presentada en el caso de epígrafe. Se revoca la imposición de honorarios por temeridad.*

El Juez Asociado Señor Negrón García emitió una opinión disidente. El Juez Asociado Señor Fuster Berlingeri disintió sin opinión escrita. El Juez Asociado Señor Corrada Del Río no intervino.

— O —

Opinión disidente del Juez Asociado Señor Negrón García.

Un ciudadano fotografiado en una actividad pública que, desde el balcón abierto de su hogar, responde por cortesía al saludo de manos de un candidato político: ¿renuncia a su derecho a la intimidad?; ¿implica ello una autorización a que esa foto, que destaca su imagen, se publique como *anuncio* en la propaganda de la campaña partidista de ese candidato, que infiere su apoyo éste?

Responder recta y jurídicamente a estas interrogantes requiere un examen acucioso de la fotografía y el anuncio en cuestión. Recordemos que " '... la simple vista es anterior al microscopio; y si es verdad que los ojos sanos no ven tantas cositas como el microscopio ..., lo que los ojos pueden ver es más cierto, y sin ellos el microscopio es nada' ".

L. Castellani, *Comentarios a la Suma Teológica*, citado por P.J. Bertolino, *La Verdad Jurídica Objetiva*, Buenos Aires, Ed. Depalma, 1990, pág. 101.

## I

El 19 de noviembre de 1991 se llevó a cabo una caminata en el pueblo de Isabela para rechazar el consumo de drogas. Participaron en la actividad: líderes cívicos, religiosos y políticos de *varios* partidos; entre ellos el Dr. Pedro Rosselló, candidato entonces a la gobernación por el Partido Nuevo Progresista (en adelante P.N.P.), y el Sr. Carmelo Rivera, Alcalde de Isabela, también del P.N.P. La actividad cívica se denominó: "Isabela dice No a las Drogas, Marcha por Puerto Rico sin Drogas y una Isabela sin Coca."

El Sr. Luis Bonilla Medina se encontraba en compañía de su madre Doña Miguelina Medina y una joven en el balcón abierto de su hogar que colinda y se proyecta en la acera. Cuando la caminata discurrió frente de su balcón, el doctor Rosselló extendió, *desde la acera*, su mano en señal de saludo, gesto que el señor Bonilla Medina cortésmente correspondió *desde su balcón*, estrechándosela. Sin que el señor Bonilla Medina se percatara de ello, tal saludo fue captado por un lente fotográfico *desde fuera* de la residencia.([1])

---

([1]) Incluimos la foto como Apéndice (A). Aparece en primer plano el señor Bonilla Medina en la parte cercana a la entrada al balcón abierto de su residencia. Tiene la mano derecha extendida y una expresión seria. Viste con una guayabera clara, de mangas cortas. Frente, al lado derecho, está el doctor Rosselló estrechándole la mano derecha, mientras su mano y antebrazo izquierdo están sobre la mano derecha y brazo del señor Bonilla Medina. El doctor Rosselló tiene la mirada fija en la del señor Bonilla Medina, medio sonreído y parece escuchar algo. Viste con una camisa casual a rayas de mangas cortas y lleva un reloj y un aro de matrimonio en su mano izquierda.

Observamos también dos (2) figuras de mujer asomadas a una puerta. La primera es una anciana, la madre de Bonilla Medina, con un pañuelo en la cabeza y una bata clara tipo casual; observa el saludo sin expresión particular. La otra, una joven de pelo oscuro, que mira el saludo de forma curiosa. Viste con un traje claro.

Cuatro (4) meses después, el 30 de marzo de 1992, se publicó dicha foto en los periódicos *El Vocero de Puerto Rico* y *El Nuevo Día* como parte de un *anuncio propagandístico político-partidista, auspiciado por el P.N.P.* La foto que fue *publicada* es la misma antes descrita, reducida y recortada en su parte derecha. (Véase Apéndice B). El anuncio expone en su parte superior en letras claras y grandes el lema de campaña: *"Rosselló con la Fuerza del Pueblo."* En su parte inferior aparece un programa del ciclo de visitas a pueblos del doctor Rosselló, en calidad de candidato a Gobernador por el P.N.P., con el símbolo oficial del partido político mencionado. Al pie contiene en letras grandes y claras el lema: *"... Por un nuevo comienzo."* Al margen izquierdo inferior dice *"Anuncio Político Pagado".*

El 26 de mayo de 1992 el señor Bonilla Medina, su esposa la Sra. María Vázquez Avilés y la sociedad legal de gananciales Bonilla-Vázquez presentaron en el Tribunal Superior, Sala de San Juan, una demanda por daños y perjuicios contra el P.N.P., el doctor Rosselló y otros. En síntesis, alegaron que el señor Bonilla Medina no se percató de que lo hubieran fotografiado al saludar al doctor Rosselló; que en menosprecio de su derecho a la intimidad se publicó la foto a sus espaldas, sin su previa autorización o consentimiento; que el señor Bonilla Medina es un conocido miembro fundador del Partido Popular Democrático (en adelante el P.P.D.) en la comunidad de Isabela y pueblos aledaños; que los anuncios transmiten el falso mensaje de que él había ingresado al P.N.P., y que luego de la publicación ha sufrido vejámenes, insultos y desprecio por personas de su comunidad que entendieron que había traicionado sus principios políticos.

El 22 de julio los codemandados solicitaron la desestimación sumaria de la demanda. Luego de varios trámites,

---

Al lado derecho, detrás del doctor Rosselló vemos un hombre, que se indica es el Alcalde Rivera de Isabela. Viste pantalón oscuro y polo deportivo a rayas; aparece atento mirando el saludo. Detrás se ve, parcialmente oculta, una persona.

el 29 de junio de 1994, la ilustrada sala de instancia (Hon. Carmen Celinda Ríos, Jueza), accedió y dictó una sentencia desestimatoria.

Dicho foro concluyó que el doctor Rosselló y su comitiva partidista "entrar[on] hasta el balcón de su residencia, renunci[ando el Sr. Bonilla Medina] a toda legítima expectativa de intimidad sobre lo que ocurrió específicamente en el frente y el balcón de su hogar". Apéndice, pág. 23. A renglón seguido consignó que "[a]l consentir la entrada sin ninguna salvaguarda o limitación, el demandante *convirtió* el frente y el balcón de su casa en un foro público". (Énfasis suplido.) Íd. Caracterizó de inmeritoria la demanda e impuso dos mil dólares ($2,000) por honorarios de abogado por temeridad, más las costas.

A solicitud del señor Bonilla Medina *et al.*, revisamos.([2])

## II

El trasfondo de los hechos que da génesis a este recurso presenta una compleja colisión entre el *derecho a la inti-*

---

([2]) Como señalamientos discuten:

"PRIMER ERROR: Erró el Honorable Tribunal recurrido al tomar como cierto 'que el demandante renunció a su expectativa de intimidad al permitir la entrada hasta el balcón de su hogar al Dr. Pedro Rosselló y su comitiva partidista que lo acompañaba'.

"SEGUNDO ERROR: Erró el Honorable Tribunal recurrido en tomar como cierto que la actividad en la cual se tomó la fotografía objeto de este litigio era una actividad proselitista.

"[TERCER] ERROR: Erró el Honorable Tribunal recurrido al determinar que no existían controversias de hechos esenciales y procedía dictar sentencia sumaria a favor de los demandados.

"[CUARTO] ERROR: Erró el Honorable Tribunal recurrido al determinar que la entrada sin ninguna salvaguarda o limitación, el demandante convirtió el frente y el balcón de su casa en un foro público.

"[QUINTO] ERROR: Erró el Honorable Tribunal recurrido al determinar que no existe razón ni base legal alguna para reclamar que las fotografías que le tomaron al demandante como a su madre violaron el derecho a la intimidad.

"[SEXTO] ERROR: Erró el Honorable Tribunal recurrido al determinar que el caso de Colón v. Romero Barceló, 112 DPR 573 es distinguible del presente caso debido a que en dicho caso ninguno de los demandantes consintió a renunciar su derecho a la intimidad.

"[SÉPTIMO] ERROR: Erró el Honorable Tribunal recurrido al determinar que la parte demandante fue temeraria." Petición de *certiorari*, págs. 5-6.

*midad —propia imagen e identidad—* y la *libertad* de expresión en su faceta de los candidatos en la arena del partidismo político. Estos derechos nos obligan a hacer un equilibrio en función de sus reconocidas gradaciones jerárquicas y limitaciones recíprocas. En una apretada síntesis analógica, el *derecho a la intimidad equivale al corazón* de cada ser humano; la *libre expresión,* la sangre que lo nutre y, que a su vez, *vivifica la democracia.*

Sabido es que ambos derechos —intimidad y expresión— presentan contenidos diferentes y, por ende, distintos límites y efectos al proyectarse e insertarse en la realidad social. El *derecho a la intimidad personal* forma parte del catálogo que la doctrina jurídica moderna llama *derechos de la personalidad.* Corresponde a la esfera espiritual de la persona en unión a su nombre, moral de autor, honor, imagen propia, identidad (política, profesional, ocupacional), integridad psicofísica, voz, etc. R. De Ángel Yagüez, *La protección de la personalidad en el Derecho Privado,* 83 Rev. Der. Notarial 1, 42 (1974); C. Roger Vidal, *Bienes de la personalidad, derechos fundamentales y libertades públicas,* Bolonia, Pub. Real Col. de España, 1985, pág. 30 *et seq.*; J. Beltrán De Heredia y Castaño, *Construcción jurídica de los derechos de la personalidad,* Discurso Real Academia de Jur. y Leg., Madrid, 1976, pág. 29.

La intimidad es "uno de los derechos de la personalidad, de índole innata y privada, inherente al hombre". *Arroyo v. Rattan Specialties, Inc.,* 117 D.P.R. 35, 59 (1986). Véase *P.R. Tel. Co. v. Martínez,* 114 D.P.R. 328, 338 (1983). Opera *ex proprio vigore* y su infracción puede hacerse valer y generar indemnización, aun entre personas privadas.(³) *Colón v. Romero Barceló,* 112 D.P.R. 573, 576 (1982); *Figueroa Ferrer v. E.L.A.,* 107 D.P.R. 250 (1978); *E.L.A. v. Herman-*

---

(³) "Se trata de la inviolabilidad personal en su forma más *completa y amplia.* El honor y la intimidad son valores del individuo que *merecen protección cabal,* no sólo frente a atentados provenientes de otros particulares, sino también contra ingerencias abusivas de las autoridades." 4 Diario de Sesiones de la Convención Constituyente 2566 (1951).

*dad de Empleados*, 104 D.P.R. 436 (1975); *Alberio Quiño-
nes v. E.L.A.*, 90 D.P.R. 812 (1964); *González v. Ramírez
Cuerda*, 88 D.P.R. 125 (1963).

En *Colón v. Romero Barceló*, supra, al refrendar una
acción por daños e *injunction* por la lesión que ha sido cau-
sada por la publicación de una foto grotesca de un cadáver,
para fines propagandistas, en torno al *referéndum* consti-
tucional sobre el derecho a la fianza, sin el consentimiento
de los herederos del difunto, citamos *in extenso*:

> No aparece, *prima facie*, en el Código civil español rastro al-
> guno de los derechos esenciales de la persona. Pero, en reali-
> dad, la vida, la libertad, el nombre, el honor y demás bienes
> personales, aun sin tener una clara conceptuación de derechos
> subjetivos, tienen, sin embargo, en nuestro Derecho, aparte de
> la correspondiente protección de orden penal, *la tutela civil re-
> sultante de la acción de indemnización que con carácter general
> establece el art. 1.902 del Código civil, contra el que, por acción
> u omisión, causa daño a otro interviniendo culpa o negligencia.*
> (Énfasis suplido.) Castán, *Derecho Civil Español, Común y Fo-
> ral*, 1971, T. I, Vol. 2, pág. 341.
> Santos Briz explica el derecho con referencia a la propia ima-
> gen:
> En virtud de este derecho *toda persona puede oponerse* a que
> se reproduzca su efigie o se obtengan pruebas fotográficas de la
> misma, *por personas a quienes no haya concedido autorización
> expresa o tácita.* Se extiende la prohibición a reproducir la ima-
> gen de otro en el teatro, el cine o la televisión; y comprende no
> sólo la publicación de la imagen sino también la confección,
> dibujo o pintura de la misma sin autorización cuando se oponga
> a legítimos intereses del afectado, *en especial* si según el objeto
> de la fotografía *o el modo y forma de la obtención resulta escan-
> dalosa o tuvo lugar contra la voluntad conocida del per-
> judicado. La autorización para hacer una fotografía no incluye
> la autorización para publicarla, ya que la publicación afecta a
> la personalidad del interesado más intensamente que el simple
> hecho de retratarlo.* La autorización para ser publicada puede
> incluir alguna limitación cuya amplitud se determinará según
> la interpretación del caso concreto.
> Cierta doctrina e incluso legislación extranjera considera ad-
> misible, sin perjuicio de otras causas de justificación, *la publi-
> cación o la toma de fotografías en la esfera llamada de historia
> contemporánea* ("aus dem Bereich der Zeitgeschichte") no refe-
> rida a la vida privada, o *cuando reproduzcan reuniones, mani-*

*festaciones u otros actos públicos semejantes o sucesos o locali-
dades públicos en los que la persona fotografiada sea una figura
accesoria.* Además, se admite la publicación de fotografías he-
chas sin petición del interesado cuando así lo justifique un serio
interés artístico. Pero aun en estos casos no debe tolerarse ha-
cer una fotografía o publicarla cuando a ello se oponga un inte-
rés legítimo del fotografiado. *Igualmente ha de considerarse in-
admisible la publicación de una fotografía cuando la toma de la
misma haya violado intereses dignos de una protección predo-
minante, aunque la publicación misma no se oponga a dichos
intereses.*

No hay en nuestro Derecho, como unánimemente reconocen
los autores, normas jurídicas que directamente protejan la es-
fera personal consistente en prohibir la reproducción de la pro-
pia imagen. No queda otro medio para esta protección que acu-
dir al Código penal cuando la reproducción de la imagen
constituya un delito de injurias o de calumnia, *o considerar,
cuando se trate de infracción civil derivada de culpa extracon-
tractual, que su protección se establece en el amplísimo precepto
del artículo 1.902 del Código civil. Queda, pues, hasta ahora
conferida la apreciación de los casos concretos al prudente arbi-
trio de los Tribunales que se apoyarán principalmente en las
circunstancias que concurran, tanto para incriminar los hechos
como delito o falta, como para pronunciarse acerca de la san-
ción civil correspondiente.* Santos Briz, *Derecho de Daños*, Ma-
drid, 1963, págs. 178–179. (Énfasis suplido y en el original.)
*Colón v. Romero Barceló*, supra, págs. 578–579.

Ahora bien, la protección constitucional de la intimidad
no es absoluta. Cederá ante valores fundamentales, en cir-
cunstancias especiales e intereses apremiantes, y ante la
ausencia de otros medios alternos para lograr tales
objetivos.([4]) Uno de estos valores constitucionales, de tras-
cendental importancia, es el *derecho a la libre expresión* de
ideas, opiniones, creencias y demás juicios personales
valorativos.

Partimos de la premisa de que en nuestra democracia

…la legitimidad del Gobierno depende del consentimiento de
los ciudadanos, esto es, "la voluntad del pueblo es la fuente del

([4]) En *Colón v. Romero Barceló*, 112 D.P.R. 573 (1982), tomamos en considera-
ción que los demandados podían llevar a cabo su mensaje de otra forma y medios, sin
lesionar la intimidad de los demandantes.

poder público ...". ... Damos este consentimiento mediante elecciones imparciales y justas ... [por lo tanto, p]ara que la democracia triunfe y alcance su más alto potencial es menester que los ciudadanos puedan considerar y deliberar todas sus opciones en un espíritu de libertad de conciencia. ... [N]uestra Constitución contiene varias disposiciones dirigidas a garantizar que el proceso de deliberación democrático permanezca libre, y no discriminatorio. *Una de las funciones principales de la libertad de expresión es fortalecer el debate de ideas políticas entre los ciudadanos, pues no puede haber consentimiento democrático cuando no se pueden expresar opiniones contrarias, disidentes y heterodoxas.* Igualmente, al establecer el derecho al voto, la Sec. 2 del Art. II, Const. E.L.A., *supra*, lo entrelaza con su propósito ulterior de garantizar la expresión libre de la voluntad ciudadana. Finalmente, la libertad de asociación integra estos dos (2) derechos al preservar un espacio en el cual los ciudadanos puedan congregarse en organizaciones con el fin de unir sus voces y expresar sus preferencias políticas. (Énfasis en el original suprimido y énfasis suplido.) *P.P.D. v. Gobernador I*, 139 D.P.R. 643, 713–724 (1995), opinión concurrente.

En consecuencia, no se debate el derecho legítimo de un candidato político a realizar una campaña proselitista y comunicarle a los ciudadanos sus puntos de vista, ideas, mensajes y, claro está, anunciar su itinerario de campaña. Sin embargo, tampoco estamos ante un derecho absoluto e irrestricto y "pued[e] subordinarse a otros intereses cuando la necesidad y conveniencia públicas lo requieran". *Mari Bras v. Casañas*, 96 D.P.R. 15, 21 (1968).

En la dinámica de la política partidista puertorriqueña no podemos imponer restricciones que innecesariamente graven el derecho a la libre expresión de los candidatos políticos. Tomamos conocimiento judicial de que en caminatas, caravanas de automóviles, mítines, reuniones y en otras formas de hacer este tipo de campaña, es normal y natural que haya fotógrafos y camarógrafos privados o de la prensa del país cubriéndolas constante e instantáneamente. En eventos públicos y semipúblicos el derecho a la libre expresión significa que los candidatos y la prensa no tienen que solicitar permiso o autorización previa de los que participan o curiosean, quienes, claro está, se exponen

a ser retratados o filmados por medio del video o la cámara. La expectativa de privacidad de quienes estén en sitios públicos o semipúblicos, los cuales sean susceptibles de ser captados por los lentes de una cámara fotográfica o un video, es mínima; no pueden oponerse a esa toma fotográfica o fílmica.

En *Cox v. Hatch*, 761 P.2d 556 (Utah 1988), el Tribunal Supremo de Utah tuvo ante su consideración un caso de difamación, invasión a la intimidad y abuso de la identidad personal, por razón de una (1) foto entre cinco (5) publicadas en un folleto de ocho (8) páginas que contenía varios artículos laborales del Senador Hatch, como parte de su campaña de reelección. Dicho foro concluyó que su uso fue autorizado e incidental, y que la libertad de expresión prevalecía sobre el reclamo genérico del derecho a la intimidad.

La realidad fáctica, allí presente, *dista de la del caso de epígrafe*. La foto se tomó en un sitio semipúblico —las oficinas del Servicio Postal, lugar de trabajo de los tres (3) reclamantes– era una actividad proselitista, parte de la campaña de reelección del Senador; *los reclamantes eran conscientes y voluntariamente accedieron y posaron para que les tomaran la foto en cuestión junto al candidato político.*

Más importante aún, distinto al caso ante nos, dicho tribunal no detectó "alegación específica de que los demandados actuaron con negligencia o, en todo caso, con malicia". (Traducción nuestra.) *Cox v. Hatch*, supra, pág. 560. No hubo alegación indicativa de que con el uso de las fotografías "*se sacó algún beneficio de algún valor asociado a los nombres o imágenes* de los demandantes". (Traducción nuestra.) Íd., pág. 565. Tampoco hubo alegación alguna sobre *reclamo inherente a la persona.*

Sin embargo, dicho foro hizo unos pronunciamientos que a *grandes rasgos* son compatibles con nuestra doctrina

civilista. *Sin adherirnos estrictamente a su texto*, las compartimos a título de *regla general.*

*Primero,*

> [a]unque basta decir que el consentimiento es una defensa absoluta, la ley debe reconocer las obvias necesidades de las campañas políticas modernas y no imponer condiciones irreales sobre los candidatos a puestos públicos e incumbentes, quienes son frecuentemente fotografiados con otras personas en sitios públicos. Requerirle a la prensa en general, o a los políticos o los candidatos a puestos públicos, que obtengan el consentimiento de todas las personas que sean fotografiadas en lugares públicos o semipúblicos previo a la publicación de dichas fotografías, tendría el efecto de "congelar" la publicación de mucha información que está protegida por la Constitución. Tal obstáculo a la cobertura de eventos públicos por los medios noticiosos no es compatible con la Primera Enmienda. Si el consentimiento juega algún papel en este contexto, sería, sin duda, limitado. (Traducción nuestra.) *Cox v. Hatch,* supra, pág. 561 esc. 4.

*Segundo,* no es difamatorio per se señalar que alguien —en nuestra realidad política— es miembro del P.N.P., P.P.D., P.I.P. y otras agrupaciones políticas. De ordinario,

> [t]ampoco es difamatorio atribuirle a una persona que ésta apoya al candidato de uno de estos partidos. ... Es cierto, claro está, que algunas personas no le reconocen ningún mérito a cualquier otro partido que no sea el suyo y se sienten indignadas si son identificadas como miembros de otro partido. Pero tales percepciones y sensibilidades subjetivas nada tienen que ver con la reputación, ya que esa está fundamentada en el juicio colectivo de un segmento considerable de la ciudadanía. (Traducción nuestra y escolios omitidos.) *Cox v. Hatch,* supra, pág. 562.

*Tercero,*

> [a]unque una persona tenga un interés legítimo en proteger su personalidad de la explotación de los demás, ese interés es mínimo cuando la persona permite que la retraten en un lugar público o semipúblico, y *especialmente cuando uno permite que le tomen una fotografía con un político durante su campaña.* La

expectativa razonable de todos los implicados en tales circunstancias es que dichas fotografías probablemente se utilizarán en la campaña del político. No hay duda de que la publicación de una fotografía *tomada en esas circunstancias* no viola una preocupación válida y sustancial por la protección de la imagen de esa persona o su sentido de privacidad.

Contrapuesto a este interés de menor jerarquía, está la importancia prevaleciente que, para la sociedad en general, tiene sostener el libre flujo de información pública. La tecnología moderna expone a toda persona que se encuentra en un lugar público a la posibilidad de ser fotografiada. Eventos y personas de interés noticioso atraen las cámaras de televisión y prensa escrita como un imán. Dado el hecho de que la divulgación y grabación de información de interés noticioso es un asunto de tan alta prioridad, es de esperarse que personas que se encuentran en lugares públicos o semipúblicos, y que inesperadamente caen dentro del lente de las cámaras de los noticiarios, no posean un interés de intimidad que pueda prevalecer sobre el interés de información de la Primera Enmienda. Lo mismo aplica con mayor fuerza a aquellos que voluntariamente permiten que se les retrate. *Cf. Hustler Magazine v. Falwell*, 485 U.S. 46 (1988). Si la ley proveyera lo contrario, la cobertura de eventos noticiosos por medios electrónicos, o de otra índole, sería restringida de manera significativa. En resumen, resolvemos que las fotografías de funcionarios públicos y de candidatos a cargos públicos que sean tomadas en lugares públicos o semipúblicos, con personas que posen con ellos o que, inadvertidamente, aparecen en dichas fotografías no pueden ser fundamento para una acción por invasión de la intimidad o abuso a la personalidad. (Traducción y énfasis nuestros.) *Cox v. Hatch*, supra, pág. 563.

## III

De acuerdo con estos predicados, es obvio que el señor Bonilla Medina *renunció* a su expectativa de privacidad y no *podía objetar la toma de la fotografía*. Ahora bien, es evidente que, maliciosa e intencionalmente, su imagen fue utilizada con posterioridad por el P.N.P. en otro contexto; esto es, un anuncio político para comunicar y promover la idea de que el señor Bonilla Medina endosaba al candidato, doctor Rosselló. Esa es la única conclusión razonable que

cabe.([5]) De lo contrario, ¿para qué se publicó? Ciertamente tuvo el propósito de comunicar y llevar al electorado a esa conclusión partidista particular, ello sin su autorización. El P.N.P. tenía otras alternativas: ¿Por qué no se imprimió el itinerario con el solo retrato del candidato? ¿Por qué usar la imagen del señor Bonilla Medina si, como se aduce, ni siquiera conocían su afiliación política? *No podemos pecar* de ingenuos. La regla general propugnada de que una persona que públicamente, en eventos políticos, se expone a ser fotografiada, y no puede objetar que de forma *incidental* su imagen sea publicada, *no aplica al caso de autos.* Estamos ante una situación fáctica *muy peculiar* que, por excepción, protege las *reservas al uso indiscriminado de esa imagen.*

No es persuasiva la tesis de los demandados P.N.P. *et al.*, de que la colocación de la imagen del señor Bonilla Medina "en el anuncio político fue incidental al propósito del Partido Nuevo Progresista, que fue el promover la imagen de su candidato a la gobernación, Dr. Pedro J. Rosselló González".

Las propias tres (3) fotografías en autos, que fueron presentadas por el P.N.P., revelan las opciones que bien pudo utilizar sin lesionar la imagen e identidad política del señor Bonilla Medina. Precisamente, la tercera foto muestra al doctor Rosselló, en otra escena, saludando a una señora que estaba sentada en un balcón abierto de otra residencia acompañada de unos niños. Véase Apéndice C. El doctor Rosselló aparece seguido de toda su numerosa comitiva. Es evidente que la idea ínsita en la frase "Rosselló Con la Fuerza del Pueblo" con la imagen destacada del señor Bonilla Medina (en el fondo su madre y al lado una joven), saludando aquél al doctor Rosselló, desde el punto de vista numérico no hace mucho sentido, pues una sola persona en

---

([5]) Según expusimos en *P.P.D. v. Gobernador I*, 139 D.P.R. 643 (1995), los tribunales pueden examinar y llegar a sus propias conclusiones en torno a la naturaleza y propósitos partidistas de unos anuncios.

unión a dos (2) familiares no puede considerarse "el pueblo". De hecho, para que el anuncio publicado correspondiera con el mensaje de "Rosselló Con la Fuerza del Pueblo" era menester atribuirle a la imagen del señor Bonilla Medina un *significado especial y una capacidad electoral mayor.* Entonces la publicación se explica, si se tiene conocimiento de que el señor Bonilla Medina era miembro y fundador del P.P.D. en Isabela, y puede inferirse que el anuncio fue confeccionado para transmitir el mensaje equívoco de que estaba del lado del P.N.P.

Es innegable que, al menos en el pueblo de Isabela, el endoso público del señor Bonilla Medina, conocido miembro fundador del P.P.D. —partido principal de oposición— al candidato a la gobernación del P.N.P. tuvo un gran valor propagandístico; ello a expensas de un *valor intrínseco* que pertenecía individualmente a su persona y que no podía ser explotado de ese modo, mediante la publicación de su imagen *sin su autorización.*

La publicación de ese anuncio en la campaña publicitaria del P.N.P. fue un atentado directo al derecho a su propia *identidad política.* Se trata del

> *interés jurídico que tiene la persona a no ver tergiversado o alterado* el propio patrimonio intelectual, político, social, religioso, ideológico, profesional, etcétera. Mientras la imagen se refiere a la mera reproducción física de la persona, la *identidad representa una fórmula compleja que sirve para distinguir al sujeto en su propia individualidad, frente a los demás componentes de la sociedad.* R. Vázquez Ferreyra, *Responsabilidad civil por lesión a los derechos de la personalidad,* XLV (Núm. 3) Rev. Jur. Derecho 40–41 (1995).

La mayoría, de forma acertada, arguye que "se 'considera admisible, sin perjuicio de otras causas de justificación, la publicación o la toma de fotografías en la esfera llamada de historia contemporánea (*aus dem Bereich der Zeitgeschichte*) no referida a la vida privada, o cuando reproduzcan reuniones, manifestaciones u otros actos públicos semejantes o sucesos o localidades públicos en los que la

persona fotografiada sea una figura accesoria". Opinión del Tribunal, pág. 301. Sin embargo, hemos explicado aquí por qué dichas expresiones no son aplicables al caso de autos.

## IV

No altera esta conclusión el aserto mayoritario de que, "[d]e ordinario, en una campaña para cualquier cargo electivo, tanto la prensa como el propio candidato toman fotografías de todos los eventos políticos y *no es hasta que concluye la actividad que se seleccionan las que se van a utilizar en la campaña*". (Énfasis suplido.) Opinión del Tribunal, pág. 303. Preguntamos, el *momento* de esa selección: ¿es criterio que legitima la concesión de una licencia judicial que lesiona el derecho a la propia imagen e identidad política ciudadana?

Según el cuadro doctrinario que *antecede y de acuerdo con las peculiaridades fácticas presentes*, el derecho a la intimidad del señor Bonilla Medina debe prevalecer. Aunque éste, al públicamente extenderle de forma voluntaria la mano al doctor Rosselló renunció a su derecho a la intimidad y, por ende, no podía exigir autorización previa para ser fotografiado, esa renuncia no conllevó el uso propagandístico *en otro contexto* de su propia imagen, y la distorsión pública de su conocida identidad política; máxime cuando no sabía el señor Bonilla Medina el uso *particular* que prominentemente se le iba a dar a la foto. *En este sentido, dicho anuncio atribuye al saludo un alcance distinto del natural. Analizado en su totalidad, visto con las frases aludidas, comunica al lector un endoso partidista falso y un mensaje evidentemente errado.*

Es pertinente recordar el origen del significado de un apretón de manos: "En la Edad Media, cuando dos hombres se encontraban en el camino, se daban la mano derecha para evidenciar que no tenían la intención de sacar su

espada. Este apretón de manos simbolizaba amistad. Ha perdurado, como gesto de cortesía, y hay muchas ocasiones cuando es necesario. Todos le dan la mano a un invitado de honor." (Traducción nuestra.) *World Book Encyclopedia*, pág. 29. Además, "[e]l apretón de manos es tan parte de la personalidad individual, como lo es nuestra manera de caminar, y aunque cambiemos y mejoremos nuestra manera de darle la mano a otro, si alguien nos hace consciente de ello, nuestro apretón de manos reflejará quién normalmente somos, bien sea tímido o seguro, cálido o distante". Íd., pág. 241.

En nuestro entorno puertorriqueño, estrechar la mano de un semejante en respuesta a su saludo es parte de nuestras buenas costumbres; es un detalle amable y amistoso. No podemos convertirlo en un factor *negativo* determinante para inferir una renuncia expresa e ilimitada al *derecho de la propia imagen e identidad política*. Equivaldría a promover la descortesía ciudadana con candidatos políticos u otras figuras públicas, que normalmente extienden la mano en señal de saludo fraternal. *Este Tribunal, en el ámbito de una lucha partidista, no debería auspiciar una norma de tan pobre valor social que carece de civilidad.*

Recapitulamos, la fotografía se publicó sin el consentimiento o la aprobación expresa o tácita del señor Bonilla Medina en *un contexto distinto*, el de un *anuncio político-partidista* (anuncio político pagado). Conforme con lo expuesto, no puede sostenerse que el mero apretón de manos constituyera su consentimiento a ese *tipo de publicación.*

El carácter político partidista del anuncio publicado es evidente: decía que era un *"Anuncio Político Pagado"*. Por la prominencia y el tamaño de la imagen del señor Bonilla Medina, es ingenuo pensar que su uso fue meramente accidental o accesorio. Evaluado de forma integral, es lógico concluir que la reacción de un lector promedio sería inferir que el señor Bonilla Medina apoyaba o era correligionario del doctor Rosselló. Con ese anuncio, el P.N.P. obtuvo el

beneficio propagandístico adicional del valor asociado a la imagen del señor Bonilla Medina; usufructuó el valor intrínseco de su conocida afiliación partidista (P.P.D.) en el pueblo de Isabela.

Existían otros medios para que el P.N.P. y el doctor Rosselló pudieran ejercer su derecho a la libertad de expresión e informar de sus actividades e itinerario de campaña sin invadir y lastimar la intimidad del señor Bonilla Medina. Ciertamente no era indispensable publicar el itinerario de las caminatas políticas con la foto del doctor Rosselló *junto con otras personas.* Ese objetivo pudo lograrse, incluso, con la publicación del mensaje sin fotografía alguna. Su inclusión pretendió lograr un anuncio *más efectivo,* desde el punto de vista publicitario del P.N.P. y su candidato. Nada les impedía obtener la autorización expresa del señor Bonilla Medina. Nada impedía tampoco que, a través de la agencia de publicidad del P.N.P., tomaran una foto para esos propósitos, con el previo consentimiento de todos los participantes.

Después de todo, se "justifica *mayor rigurosidad judicial* al evaluar los anuncios publicados que son mensajes preparados en la atmósfera tranquila y profesional de los expertos en el manejo de la opinión pública, como son los publicistas, diestros en mercadeo, comunicación, etc.". *P.P.D. v. Gobernador I,* supra, pág. 741, opinión concurrente.

Revocaríamos e impondríamos responsabilidad al P.N.P. Remitiríamos los autos originales a instancia para dilucidar los daños.